## A03A1517. LIVOTI et al. v. AYCOCK.

(590 SE2d 159)

ADAMS, Judge.

When James M. Aycock was seriously ill and not expected to recover, he sold the right to collect the proceeds of his employer's supplemental group life insurance benefits to a group of investors in a transaction known as a viatical settlement. Aycock later recovered and returned to work with his original employer and his original coverage was cancelled, but he then qualified for new group life coverage. The question presented is whether the investors acquired a right to the proceeds of Aycock's new life insurance coverage.

The parties agree on most of the facts. Aycock, an employee of Emory University's School of Medicine, had supplemental group life insurance coverage, through Emory, provided by Life of Georgia Insurance Company ("LOG"), with death benefits of $200,000. In 1995, Aycock, who had been diagnosed with AIDS 11 years earlier, qualified for long-term disability benefits due to his worsening condition. By the fall of 1996, he was on full disability leave from Emory, which triggered a waiver of premium payments on the group life policy. At that time, he was not expected to live much longer.

In October 1996, Aycock entered into a viatical settlement in which, in exchange for $144,000, he assigned "all of [his] rights, title and interest" in his LOG policy "and all renewals thereof" to a group of investors whose trustee is Anthony M. Livoti, Jr. (hereinafter referred to as "Livoti"). Aycock also assigned "the right to change and name any other beneficiary whatsoever" and "the right to exercise all conversion rights that [Aycock] may have at any time and under any circumstances." The assignment was prepared by LOG; LOG signed it and retained a copy.

In a separate document, on behalf of his own estate as the named beneficiary of his LOG benefits, Aycock executed a consent to the assignment and a release of any rights his estate had as a beneficiary under the plan. On behalf of his estate, Aycock also agreed "to execute any additional or further releases which may be necessary to more fully vest all right, title and interest in and to the Policy" to Livoti.

Prior to the transaction and as a part of his due diligence, Livoti or his agents had evaluated both the terms of the group coverage between LOG and Emory, and Aycock's medical condition. The group plan provided that the supplemental insurance would terminate on the day following retirement or severance of employment, or upon termination of the group policy itself.

Only weeks after the viatical settlement and unbeknownst to the parties, Emory changed its group life insurance carrier from LOG to Metropolitan Life Insurance Company ("MetLife"). Most active and retired Emory employees were given the right to automatically transfer their group life coverage from LOG to MetLife, effective January 1, 1997, with increased benefits in some cases and higher premiums. But Aycock and other disabled employees on premium waiver were not eligible for the new coverage while they remained on disability, and LOG remained responsible under the terms of its policy. For these employees, Emory eventually negotiated a settlement with ING Medical Risk Solutions, a successor in interest to LOG, which provided that LOG/ING would continue to provide coverage for the members of this group as long as they stayed on disability. Should a disabled employee return to work, their coverage by LOG/ING would either be cancelled or, at the option of the insured, be converted to an individual policy with a face amount of only $2,000.

Over the next four years Aycock's health improved, and by late September 2000 he returned to full time employment at Emory. In October, Aycock took two actions relative to his life insurance coverage. First, on or about October 10, he informed the LOG/ING administrator that he had returned to work, thereby triggering the cancellation of his LOG/ING coverage. Second, on or about October 13, he enrolled in MetLife's supplemental group life insurance program, and he selected $300,000 in coverage and designated new beneficiaries. Although Aycock informed Livoti's representatives of his return to work in the fall of 2000, he made no attempt to advise Livoti that his LOG/ING coverage had expired, that Emory had changed insurance carriers, or that he had enrolled for coverage with MetLife.

On April 5, 2001, Aycock informed Livoti that his LOG/ING policy had terminated. When Aycock ignored demands that he cooperate to ensure that Livoti be made the beneficiary of the MetLife policy,

Livoti filed suit alleging breach of contract and seeking specific performance. Livoti later amended the complaint to add claims for money damages, declaratory judgment, unjust enrichment, and money had and received. Aycock moved for summary judgment on all claims, and the trial court granted the motion. Livoti appeals.

The standard of review of motions for summary judgment is well known. See *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

Livoti essentially relies on two arguments. First, pursuant to a line of Georgia case law, he contends that as a result of the viatical settlement, he acquired, as a matter of law, a vested interest in Aycock's group life insurance proceeds that automatically extends to the proceeds of the MetLife policy. Second he contends that the term "and all renewals thereof" found in the assignment clearly includes the MetLife policy.

1. As a general rule, the beneficiary of a life insurance policy does not have a vested interest in the policy because the policyholder may change the beneficiary at any time:

> In an ordinary life-insurance policy, where the insured names a beneficiary by revocable designation, expressly reserving the right to change the beneficiary, the beneficiary does not by such designation acquire a vested right or interest in the policy. The insured in virtue of such express provision may at will change the beneficiary in the policy.

*Washburn v. Washburn*, 188 Ga. 468 (1) (4 SE2d 35) (1939).

In a line of divorce cases beginning in 1976, the Supreme Court of Georgia established an exception to this general rule. In *Reeves v. Reeves*, 236 Ga. 209 (223 SE2d 112) (1976), the Court addressed the common circumstance where a separation agreement incorporated into a divorce decree includes a provision establishing minor children as beneficiaries of life insurance policies owned by one or both of the divorcing parents and requiring the parent or parents to keep the policy in force for some period of time. In this setting, the Supreme Court has held that as a result of the court decree, "the minor children acquire[ ] a vested interest in the proceeds of the insurance contracts as those contracts existed on the date of the entry of the court decree." Id. at 212 (1).[1]

Since that time, the Supreme Court and this Court have extended the exception in incremental steps. In *Curtis v. Curtis*, 243 Ga. 611, 613 (255 SE2d 693) (1979), the Supreme Court held that

---

[1] Their vested interest is limited to the insurance provided by the contract at the time of the divorce decree. Id. at 212-213 (2).

minors also have a vested interest in the proceeds of any policy that "replaces a policy or amount specified in such a separation agreement [that has been incorporated into a divorce decree]." In *Curtis*, the divorce decree required the father to name his minor children as beneficiaries on his employer's group life policy. Id. at 611. After the divorce, the employer changed its group life carrier, and the father named a different beneficiary. Id. The court held that the children had a vested right in the proceeds of the replacement policy. Id. at 613. In *Whitehead v. Whitehead*, 191 Ga. App. 330 (381 SE2d 757) (1989), this Court extended the protection to a wife where the divorce decree required the husband to maintain her as the beneficiary of a life insurance policy. The two courts have also grappled with the question of what constitutes a "replacement" of the earlier policy.[2]

In the present appeal, Livoti asserts that the vesting doctrine established by *Reeves*, *Curtis*, and *Whitehead* applies to his rights as a beneficiary of Aycock's group life insurance policy such that he has a vested right to the proceeds of that policy, and any replacement policy as that term has been defined in that line of cases. We hold that the viatical settlement at issue in this case is fundamentally different from the divorce decree setting, and that the vesting doctrine is not applicable here.

An important common element of the divorce cases is that the policyholder of a life insurance policy subject to a divorce decree is often still at liberty vis-à-vis the insurance company (which is not a party to the divorce decree) to change the beneficiary. See *Reeves*, 236 Ga. at 211-212 (1). In other words, although the policyholder may violate the terms of the divorce decree by changing the beneficiary, he or she still may have the right to make a change, contractually, under the policy itself. Thus, although the original beneficiary may have a right to sue the estate of a deceased policyholder who has named another beneficiary, for breach of the divorce decree/settle-

---

[2] See, e.g., *Zobrist v. Bennison*, 268 Ga. 245 (486 SE2d 815) (1997) (distinguishing replacement or converted policies from policies that were cancelled or had lapsed without being directly replaced); *Kruse v. Todd*, 260 Ga. 63 (389 SE2d 488) (1990) (where father had changed jobs twice, each time allowing his former group policy to lapse, his third group policy *was* considered a replacement of the first policy); *Weiner v. Goldberg*, 251 Ga. 470 (306 SE2d 660) (1983) (where the father had changed jobs thereby allowing a group policy to lapse in derogation of the decree and had acquired a new job with a new group policy, the latter was not a replacement of the former); *Pope v. Skipper*, 197 Ga. App. 572 (398 SE2d 846) (1990) (where husband surrendered a $16,000 policy covered by a divorce decree and a second $25,000 policy for a third policy issued for $41,000, $16,000 of the third policy was considered a replacement of the policy covered by the decree). See also *Larson v. Larson*, 226 Ga. 209 (173 SE2d 700) (1970) (where husband's employer cancelled the policy covered by the decree and the husband later acquired an individual policy naming his second wife as the beneficiary, the principles of equity were not violated by allowing the second wife to recover on the policy).

ment agreement, *Weiner v. Goldberg*, 251 Ga. 470, 471-472 (306 SE2d 660) (1983), the vesting doctrine gives the original beneficiary an interest in the proceeds of the policy itself, and a claim against the newly named beneficiary. *Zobrist v. Bennison*, 268 Ga. 245, 246-247 (1) (486 SE2d 815) (1997). See also *Curtis*, 243 Ga. 611.

With regard to the viatical settlement at issue here, Aycock transferred all of his rights, title, and interest in the policy to Livoti, including "the right to change and name any other beneficiary whatsoever." And the insurer, Life of Georgia, drafted the assignment, signed it, and kept a copy for its files. From that day forward, Aycock did not have any authority to change the beneficiary on the LOG policy. Therefore it is unnecessary in this setting to apply the vesting doctrine to protect Livoti's right to be the beneficiary of that policy. He alone has the authority under that policy to name the beneficiary.

It follows that the extension of the vesting doctrine to "replacement" policies, as per *Curtis*, is also not applicable to this viatical settlement. This is also true because in this case the parties included their own contractual provision governing subsequent policies. The assignment provides that Aycock transferred to Livoti all of his rights, title, and interest in his LOG policy "and all renewals thereof." The assignment does not use the word "replacement," which is the term used in the case law cited above. For this additional reason, we conclude that the case law governing the applicability of the vesting doctrine to "replacement" policies is inapplicable here.

2. The assignment at issue in this case specifically identifies the applicable policy as follows:

> Group Life Insurance Policy No(s). GL 3615 issued by LIFE INSURANCE COMPANY OF GEORGIA, which life insurance is evidenced by Certificate No. 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. . . .

The assignment then provides that Aycock assigned "all of [his] rights, title and interest" to "said insurance Policy[ ], and all renewals thereof, to Anthony M. Livoti, Jr."

Livoti argues that the phrase "all renewals thereof" unambiguously applies to the MetLife policy that Aycock obtained upon his return to work at Emory or that, at a minimum, there is an issue of fact as to the meaning of the phrase. Aycock contends that because the assignment refers to "said policy" and because the word "renewals" is followed by "thereof," the only renewals to which the assignment could be applicable are renewals of the LOG policy itself. For the following reasons, we agree with Aycock.

"An issue of contract construction is at the outset a question of law for the court." *Grier v. Brogdon*, 234 Ga. App. 79, 80 (2) (505 SE2d 512) (1998). The first step is to look to the four corners of the

instrument to determine the intention of the parties from the language employed. *Terry v. State Farm Fire &c. Ins. Co.*, 269 Ga. 777, 778-779 (2) (504 SE2d 194) (1998); *Amstadter v. Liberty Healthcare Corp.*, 233 Ga. App. 240, 242 (1) (503 SE2d 877) (1998); OCGA § 13-2-3. In so doing, all the attendant and surrounding circumstances may be proved but not explained. OCGA § 13-2-2 (1). See *Thomas v. B & I Lending*, 261 Ga. App. 39, 42 (581 SE2d 631) (2003).

If the contract language is ambiguous, the court must apply the applicable rules of construction. *Grier*, 234 Ga. App. at 80; OCGA § 13-2-2. Even in the case of ambiguous contracts, unless such ambiguity remains after the trial court has applied all rules of construction, there is no jury question. *Dorsey v. Clements*, 202 Ga. 820, 823 (44 SE2d 783) (1947). See also *Kobryn v. McGee*, 232 Ga. App. 754, 755-756 (1) (503 SE2d 630) (1998). And, normally, only if the ambiguity is not resolved by application of the rules of construction may parol evidence be introduced to explain the agreement, at which point the question of what was intended becomes an issue of fact for the jury. Id. at 756 (4). See also OCGA §§ 13-2-2 (1); 24-6-1; *Karlan, Inc. v. King*, 202 Ga. App. 713, 715-716 (1) (415 SE2d 319) (1992).

The phrase "all renewals thereof" is not ambiguous as used in the assignment. First, the assignment specifically identifies only one policy, the LOG group policy, and the use of the word "thereof" clearly indicates that the assignment applies only to renewals of that policy. Second, although the assignment itself does not define the word "renewal," that term is used in the referenced group policy itself. Overlooked by the parties in their briefs is the fact that the declaration page of Emory's group policy with LOG indicates that the group policy had a "Yearly Renewable Term." Under the term "insurance" in Black's Law Dictionary, "renewable term insurance" is defined as follows:

> Insurance that the insured may continue at the end of a term, but generally at a higher premium. The insured usu[ally] has the right to renew for additional terms without a medical examination.

Black's Law Dictionary (7th ed. 1999). In other words, while it was in effect, the LOG policy renewed annually. The manifest intent of the parties was that the assignment would include these annual renewals of the LOG policy, and nothing more.[3]

Livoti argues strongly that the definition of "renewal" found in

---

[3] See also OCGA § 33-24-45 (b) (2) (for automobile policies, " 'Renewal' means issuance and delivery by an insurer of a policy superseding at the end of the policy period a policy previously issued and delivered by the same insurer. . . .").

Black's Law Dictionary supports his position. Black's defines "renewal" as follows:

> 1. The act of restoring or reestablishing. 2. The re-creation of a legal relationship or *the replacement of an old contract with a new contract*, as opposed to the mere extension of a previous relationship or contract.

(Emphasis supplied.) Black's Law Dictionary (7th ed. 1999). Livoti contends that the emphasized phrase in the second definition indicates that a replacement policy by an unrelated carrier could be seen as a renewal.

Georgia law is inconsistent with Livoti's expansive reading of the second definition. A review of applicable Georgia law shows that the second definition quoted above has a more limited meaning. One of the most common questions concerning the exact meaning of the term "renewal" is whether a renewed contract between the same parties is to be considered merely an extension of the first contract or a wholly new contract.[4]

As can be seen from reading these and other cases, the phrase relied upon by Livoti in the second definition of "renewal" in Black's is taken out of context. The full second definition is: "The re-creation of a legal relationship or the replacement of an old contract with a new contract, *as opposed to* the mere extension of a previous relationship or contract." (Emphasis supplied.) This definition merely highlights the difference between having a new contract rather than an extension of the same agreement. We find no Georgia law indicating that the definition of the term "renewal" would include a wholly separate and new contract with different terms between different parties.

Our conclusion is supported by the fact that the term "renewal" in Georgia case law refers to another contract that continues the same obligation.

> [A]n obligation is renewed when the same obligation is carried forward by the new paper or undertaking, whatever it

---

[4] See, e.g., *Progressive Preferred Ins. Co. v. Brown*, 261 Ga. 837, 838 (1) (413 SE2d 430) (1992) (with regard to insurance policy, "[w]hether a renewal creates a new contract, or extends the original contract, depends primarily on the intention of the parties"); *Citizens Oil Co. v. Head*, 201 Ga. 542, 543 (40 SE2d 559) (1946) (renewal of lease is a new lease, for a new term, under the same terms of the original contract); *Ins. Indus. Consultants v. Essex Investments*, 249 Ga. App. 837, 840 (2) (549 SE2d 788) (2001) (" '[R]enewal' contemplates the execution of a new contract, whereas 'extension' does not. [Cits.]") (punctuation omitted); *Brannen/Goddard Co. v. Sheffield, Inc.*, 240 Ga. App. 667, 669 (524 SE2d 534) (1999) ("terms 'renewal,' 'new lease,' and 'extension' are sometimes used interchangeably and often confused"); *Wisener v. American Southern Ins. Co.*, 150 Ga. App. 795, 796 (258 SE2d 908) (1979) (" 'Renewal' means just that – renewal of the terms of the original policy.").

may be. There may be a change of parties. There may be an increase of security, but there is no renewal unless the obligation is the same. What makes the renewal is an extension of time in which to discharge the obligation. If the obligation changes, there can be no renewal, because there can be no such thing as the re-establishment of an old obligation by the creation of a new obligation different in character.

*Lowry Nat. Bank v. Fickett,* 122 Ga. 489, 492 (50 SE 396) (1905). Although *Lowry Nat. Bank* dealt with promissory notes and not insurance policies, we find the reasoning supportive here. Cf. *Parris & Son, Inc. v. Campbell,* 128 Ga. App. 165, 168 (196 SE2d 334) (1973) (definition of renewal from a leasing case applied to an insurance dispute). And in this case, MetLife did not continue LOG's obligation to provide death benefits under Aycock's LOG policy. Rather, Aycock's LOG policy was cancelled by its terms, and Aycock signed up for new coverage, with new terms, from a new carrier.[5] Accordingly, the Met-Life policy was not a renewal of the LOG policy referred to in the assignment. The trial court did not err in granting summary judgment on this point.

The fact that Aycock admitted during the litigation that he would have signed an assignment that did clearly include any replacement group life insurance coverage that he might have acquired from Emory is irrelevant. Whether he would have signed a different agreement is not evidence of his intent in signing the one he did. And it is impermissible parol evidence. Similarly, the fact that Aycock, after the dispute between the parties arose, consented to disclosure of information concerning "any replacement or substitution of" the LOG policy is irrelevant to the issue in this case. That Aycock agreed to allow Livoti access to information regarding his MetLife coverage in connection with the dispute that had developed between them is not evidence of acts and conduct by a party to a contract that reflects the meaning of the contract by that party. See generally *Quadron Software Intl. Corp. v. Plotseneder,* 256 Ga. App. 284, 288 (568 SE2d 178) (2002). The consent to disclosure simply does not admit an obligation under the assignment.

We find no merit to Livoti's attempt to introduce expert opinion testimony that the meaning of the term "renewal" would include a different policy from a different insurer that simply succeeds an earlier group policy that has been terminated. First, a thorough reading

---

[5] We further note the obvious point that Livoti's proposed construction of the term "renewal" would cause much confusion concerning the meaning of the term "nonrenewal," which is often used in the insurance industry and in laws regulating that industry. See, e.g., OCGA § 33-24-38.

of the affidavit shows that it contains nothing more than the affiant's opinion of the intent of the parties in the relevant transaction, and, accordingly, the testimony is inadmissible parol evidence. OCGA § 13-2-2 (1). Second, even if the affidavit sought to show the definition of the term according to the customs of the life insurance or viatical industry, "[t]he custom of any business or trade shall be binding only when it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract. . . ." OCGA § 13-2-2 (3). There is no evidence in the record that the alleged broad meaning of "renewal" in the life insurance or viatical industry is of such universal practice that by implication it became a part of the assignment at issue here. Indeed, Livoti admits that the viatical industry was, at the time, "in its infancy." Furthermore, as shown above, the assignment referred to a life insurance policy that, by its own terms, was "yearly renewable." It is impossible to read this to refer to subsequent policies by different carriers.

Livoti also argues, in essence, that it only makes sense that the investors meant to recover Aycock's life insurance benefits, up to $200,000, regardless of any possible changes that may have occurred in the remainder of Aycock's life. But this Court finds it easy to imagine, under the terms of the assignment at issue, other scenarios under which Livoti would not be eligible for death benefits under a policy on Aycock's life. For example, after Aycock was no longer disabled, he may have elected to never work again, to avoid life insurance coverage for a few years, and then purchase his own policy with benefits of much more than his LOG benefits. In that case, Aycock's LOG coverage would have been cancelled when he failed to show proof of a disability, and nothing in the assignment would have given Livoti the right to collect on Aycock's individual policy. The terms of the assignment fail to take into account various other scenarios that could arise relative to Aycock's health and subsequent life insurance coverage. Just because the investors may have lost their investment in this case does not mean that this Court should rewrite the terms of the assignment to ensure that they would collect under any conceivable circumstance.

Finally, the trial court decision in *Cunningham v. Guardian Life Ins. Co.*, 24 Emp. Ben. Cas. 2959 (BNA) (E.D. Ky. 2000), is not controlling or persuasive, and is distinguishable in a material respect. In *Cunningham*, an employee with AIDS who was covered by his employer's group life insurance policy entered into a purchase and sale agreement of his policy benefits on October 13, 1998, and executed an assignment of his rights under the specified policy to certain investors in "mid-October." The assignment made no mention of renewal, replacement, or successor policies. On October 23, his employer announced a change in the group life carrier effective Janu-

ary 1, 1999. On November 5, 1998, the employee signed up with the new carrier and named his sister as the beneficiary. On November 12, he accepted the $63,360 payment from the viatical investors for his assignment. The employee died in May 1999, and his sister brought a declaratory judgment claim regarding her right to the proceeds of the second group life policy. Upon motions for summary judgment, the trial court held that the viatical purchasers were entitled to the life insurance benefits of the second policy.

First, a federal district court decision may be persuasive but is not binding on this Court. *Winburn v. McGuire Investment Group*, 220 Ga. App. 384, 385 (1) (469 SE2d 477) (1996).

Second, the decision is not based on any apparent legal principle. The court appears to have simply concluded as a matter of fact that by assigning his rights under a specific group policy, the insured "[e]ssentially . . . assigned all of his life insurance benefits under [his employer's] employee benefits plan." The court only cited one case on this point, and only to distinguish it. The court distinguished *American Nat. Bank &c. Co. v. United States*, 832 F2d 1032 (7th Cir. 1987), which found that, *as a matter of contract construction*, a policy assignment that specifically included "all proceeds thereof and benefits, claims, and advantages whatsoever, now due or hereafter to arise or to be had or made by virtue thereof . . . ," did not include a subsequent policy of the insured, where, among other things, the second policy was a different policy offered by a different insurance company and where the insured was required to terminate the first policy in order to get the second. Id. at 1033-1034. The court in *Cunningham* concluded that because there was a more seamless transition between group carriers in *Cunningham* than in *American Nat. Bank*, the assignment must include subsequent group policies even though they were not mentioned in the assignment. This is despite the fact that in *Cunningham*, unlike *American Nat. Bank*, there is no language whatsoever in the assignment suggesting that it applies to any renewal, replacement, or successor policies whatsoever. Accordingly, we do not find *Cunningham* persuasive.

Finally, in the present case, the parties themselves indicated that the assignment applied to all "renewals thereof," a term with a specific meaning under the facts of this case, as shown above, that does not include subsequent policies with different carriers.

3. The only other claim mentioned by Livoti in his appellate briefs is breach of contract. Livoti's breach of contract claim is based on Aycock's agreement on behalf of his estate "to execute any additional or further releases which may be necessary to more fully vest all right, title and interest in and to the Policy" to Livoti. Our decision above controls this issue adversely to Livoti.

We deem any contention that the trial court improperly granted

summary judgment on any remaining claims abandoned. Court of Appeals Rule 27 (c) (2).

*Judgment affirmed. Andrews, P. J., and Eldridge, J., concur. Barnes, J., disqualified.*

DECIDED NOVEMBER 5, 2003 —

*Bondurant, Mixson & Elmore, Edward B. Krugman, Ronan P. Doherty*, for appellants.

*Joseph L. Kelly, Christopher J. McFadden*, for appellee.