**UTICA MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**Joe COSTA, Joe Costa & Associates, Inc., Charles Parrott, Robert S. Beal, Kay Beal, and Milton Applefield, Defendants**

No. 3:02–CV–93 (CDL).

United States District Court, M.D. Georgia, Athens Division.

Dec. 10, 2003.

Malcolm P. Smith, Kevin A. Doyle, Atlanta, GA, for plaintiff.

Kenneth Kalivoda, Alan McFarland Alexander, Jr., Athens, GA, for defendants.

## *ORDER*

LAND, District Judge.

## INTRODUCTION

Plaintiff Utica Mutual Insurance Company ("Utica") has filed a Motion for Summary Judgment in this declaratory judgment action. Utica contends that the liability provisions of the errors and omissions policy it issued to Defendant Joe Costa & Associates, Inc. ("Costa")[1] does not provide coverage for the sale of viati-

---

**1.** For efficiency, the Court will refer to both Costa & Associates, Inc. and Joe Costa as "Costa."

cal settlement agreements.[2] Therefore, Utica maintains that it has no duty to indemnify or defend Costa for any claims arising from the sale of such agreements which have been asserted in a lawsuit filed in the Superior Court of Athens–Clarke County, Georgia, by Charles Parrott, Robert S. Beal, Kay Beal, and Milton Applefield ("the underlying lawsuit").

The Court finds that the policy language relied upon by Utica in support of its position is ambiguous, thus authorizing the Court to look beyond the four corners of the policy to determine the intention of the parties. Having reviewed the evidence submitted by Costa in opposition to Utica's Motion for Summary Judgment, the Court finds that reasonable jurors could conclude that the parties intended for viatical settlements to be covered under the Utica policy. Consequently, Utica's motion must be denied.

## FACTUAL BACKGROUND

Costa, an insurance salesman in Athens, Georgia, sold viatical purchase request agreements through a viatical company known as Future First Financial Group, Inc. ("Future First"), which is based in Florida. Charles Parrott, Robert Beal, Kay Beal, and Milton Applefield invested a total of $260,000 in viatical settlements recommended by Costa. When these investments did not meet their expectations, the Beals, Applefield, and Charles Parrott sued Costa in the Superior Court of Athens–Clarke County, Georgia, claiming that Costa was liable to them under theories of negligence, breach of fiduciary duty, and fraud. Costa notified Utica of the lawsuit

2. "Viatical" is defined as "of or relating to a contractual arrangement in which a business buys life insurance policies from terminally ill patients for a percentage of the face value: *a*

and tendered it to Utica to defend. Utica is defending the lawsuit under a reservation of rights pending the outcome of this declaratory judgment action.

### A. The Utica Policy Exclusions

Utica relies upon two exclusions in its policy in support of its position that no coverage exists for the claims asserted in the underlying lawsuit. Those two exclusions are the "non-insurance contracts" exclusion and the "securities broker/dealer" exclusion.

The "non-insurance contracts" exclusion excludes from coverage:

> Any investment advice given or alleged to have been given relating to the performance or lack of performance of any investment or resulting from variations in the value of any investments including, but not limited to, stocks, bonds, real estate oil or gas, gold, silver, diamonds, or *any non-insurance contract.*

Utica Policy, Section III, Paragraph 13.a (emphasis added). Utica contends that the viatical contracts are "non-insurance contracts" and therefore excluded from coverage.

The "securities broker/dealer" exclusion excludes from coverage:

> Services as an attorney, accountant, actuary, tax preparer or tax consultant, real estate broker, *security broker, security dealer,* mortgage broker, financial planner, or any other professional services unless such professional services are specifically insured hereunder and an additional premium is paid.

*viatical settlement."* American Heritage Dictionary of the English Language (4th ed.2000); *available at* http:/dictionary.reference.com/search?q=viatical.

Utica Policy, Section III, Paragraph 14 (emphasis added). Utica maintains that viatical settlements are "securities," and that Costa acted as a "security broker or dealer" when he sold viatical settlements. Therefore, Utica argues that any claims arising from those sales are excluded from coverage under the "broker/dealer exclusion" in its policy.

## B. Viatical Settlements

The viatical settlement business involves the matching of investors with terminally ill persons ("viators") who have life insurance but need money presently. A viator receives a present cash amount equal to a percentage of the face value of the his or her life insurance policy. In exchange, the investor is named beneficiary of the viator's life insurance policy, thus being entitled to receive payment of the full face value of the policy upon the viator's death. The viatical company typically promises the investor a stated return based upon the amount invested. An investor may stipulate that he wants to invest in a life insurance policy covering a single viator or in multiple policies insuring the lives of several viators. As a result, there may be more than one investor in a given policy, so that the proceeds are divided proportionately upon the viator's death. The investor may also attempt to adjust his risk by directing the viatical company to invest in policies covering viators with specific life expectancies.

In the case *sub judice*, the viatical contracts sold by Costa allegedly contain Future First's promise to identify enforceable life insurance policies, investigate the medical condition of the terminally ill life insurance policy holders, and make the investors beneficiaries on the life insurance policies in which they invest. Furthermore, Costa allegedly guaranteed potential investors that investing in viatical settlements involved little or no risk and that they would receive a stated return based on the amount invested. After the named plaintiffs in the underlying lawsuit failed to realize the return promised on their investments, they filed the underlying lawsuit seeking to recover for their losses.

## C. Parol Evidence of the Parties' Intent[3]

■ Costa contends that before he began selling viatical settlements, an employee of Utica informed him in the summer of 1996 that such sales would be covered by his errors and omissions policy. In addition, in a May 8, 2001, letter, Mary E. Johns, a Utica Mutual Errors and Omissions Claims Specialist, advised Joe Costa that his Utica errors and omissions policy included coverage for viatical settlements.

Costa's wife, Susan Costa, also claims to have been told that the sale of viatical settlements was covered by the Utica policy. Specifically, she states that during the renewal process in the summer of 2000 an underwriter at Utica told her that a new, less expensive policy would *continue* to cover the sale of viatical settlements, if Costa changed policies.

Costa also points out that in the 1997 renewal application, Costa informed Utica that the sale of viatical settlements accounted for approximately 33% of his agency income. Likewise, in the 1998 renewal application, Costa noted that the

---

**3.** Parol evidence, or evidence outside the "four corners of the policy," is only relevant if the pertinent policy language is ambiguous. *Livoti v. Aycock*, 263 Ga.App. 897, 590 S.E.2d 159, 164, 2003 WL 22499600 at *4 (Ga.App. Nov.5, 2003).

percentage of his agency income earned from the sale of viatical settlements had increased to 48%. Costa made similar statements on other renewal applications. Even though Utica possessed this knowledge that Costa was substantially engaged in the viatical business, it never suggested that the sale of viatical settlements would not be covered by his Utica policy. In fact, as described previously, certain Utica agents affirmatively confirmed that such activity would be covered.

Costa has also produced evidence that when Utica was aware that coverage did not exist under its policy for certain business activities in which it knew Costa was engaged, Utica made it clear to Costa that such activities were not covered. Specifically, during the relevant time frame, Costa reported to Utica that, in addition to viatical settlements, he also sold exercise equipment and pay phones. In contrast to Utica's arguable acquiescence in Costa's belief that his viatical business was covered under his Utica policy, Utica specifically informed Costa that the sale of exercise equipment and pay phones would not be covered by the policy. As a result, Costa obtained other insurance coverage for his exercise equipment and pay phone businesses.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must therefore determine whether "genuine" issues of "material" fact exist to be tried. An issue is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the nonmoving party. *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir.1997). An issue is "material" if it is a legal element of the claim under applicable substantive law which may affect the outcome of the case. *Id.* In determining whether genuine issues of material fact exist to be tried, the Court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If sufficient evidence exists from which a reasonable jury could find in favor of the nonmoving party, then summary judgment is not appropriate. *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001) (citing *Clemons v. Dougherty Co.*, 684 F.2d 1365, 1369 (11th Cir.1982)).

## DISCUSSION

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332, based on diversity of citizenship between the parties. Therefore, the Court will apply the substantive law of the State of Georgia in deciding Plaintiff's Motion for Summary Judgment. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### A. General Principles of Insurance Policy Interpretation

Under Georgia law, issues of contract construction are "at the outset" questions of law for the Court. *Grier v. Brogdon*, 234 Ga.App. 79, 80, 505 S.E.2d 512, 514 (1998). "The first step is to look at the four corners of the instrument to determine the intention of the parties from the language employed." *Livoti v. Aycock*, 263 Ga.App. 897, 590 S.E.2d at 164, 2003 WL 22499600 at *4 (Ga.App. Nov. 5,

2003) (citations omitted). If the contract language is ambiguous, the Court must then apply the applicable rules of contract construction. *Id.; see also* O.C.G.A. § 13–2–2. Only if an ambiguity remains after applying these rules of construction is there a jury question. *Livoti,* 590 S.E.2d at 164, 2003 WL 22499600 at *4. The jury may then consider parol evidence to resolve the ambiguity and determine the intention of the parties. *Id.*

■ When construing insurance contracts, in particular, a court must consider the contract as a whole. *S. Trust Ins. Co. v. Dr. T's Nature Prods. Co.,* 261 Ga.App. 806, 807, 584 S.E.2d 34, 35–36 (2003), *cert. denied* Oct. 6, 2003.

> In construing an insurance policy, the test is not what the insurer intends its words to mean, but what a reasonable person in the position of the insured would understand them to mean. The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney. Where a provision in a policy is susceptible to two or more constructions, the courts will adopt that construction which is most favorable to the insured.

*Ga. Farm Bureau Mut. Ins. Co. v. Huncke,* 240 Ga.App. 580, 580–81, 524 S.E.2d 302, 303 (1999).

To determine whether the relevant provisions in the Utica policy are ambiguous, the Court is guided by the principles used by Georgia courts in making such determinations. Under Georgia law, "[a]mbiguity exists when the language may be fairly understood in more than one way; language is unambiguous if it is capable of only one reasonable interpretation." *Caswell v. Anderson,* 241 Ga.App. 703, 705, 527 S.E.2d 582, 584 (2000) (citations omit-

ted); *see also Ga. Farm Bureau Mut. Ins. Co. v. Meyers,* 249 Ga.App. 322, 324, 548 S.E.2d 67, 69 (2001) (defining "ambiguity" in insurance context). In determining whether a policy provision is ambiguous, "the court should give a term or phrase in the contract its ordinary meaning or common signification as defined by dictionaries, because they supply the plain, ordinary, and popular sense unless the words are terms of art." *Kerr–McGee Corp. v. Ga. Cas. & Surety Co.,* 256 Ga.App. 458, 459, 568 S.E.2d 484, 486 (2002), *reconsideration denied,* July 11, 2002, *cert. denied,* Sept. 16, 2002. Exclusions, such as those relied upon by Utica, "must be narrowly and strictly construed against the insurer and liberally construed in favor of the insured to afford coverage." *Meyers,* 249 Ga.App. at 324, 548 S.E.2d at 69. The Court further notes that an exclusion "may be ambiguous in one coverage context and not in another." *Kerr–McGee Corp.,* 256 Ga.App. at 462–63, 568 S.E.2d at 488.

### B.  Ambiguity of the Utica Policy Exclusions

■ Applying general rules of construction to the Utica policy, the Court finds that each of the two exclusions relied upon by Utica is capable of more than one reasonable interpretation. Therefore, the exclusions are ambiguous.

Regarding the "non-insurance contracts" exclusion, the Court must examine the nature of viatical contracts to determine whether a reasonable insured would conclude that they are "non-insurance contracts." The investor in a viatical settlement receives a return on his investment from the payment of *insurance* proceeds. This return is completely contingent upon the death of the *insured* (viator). The rate of return for the investor depends

upon actuarial variables similar to those used in pricing life *insurance* premiums. Consequently, the Court finds that a reasonable insured could conclude that, due to the close connection between viatical contracts and life insurance policies, viatical contracts are *not* "non-insurance contracts." [4] Therefore, Utica's "non-insurance contract" exclusion would not apply.

The Court acknowledges that a reasonable insured could also conclude that viatical contracts are "investment contracts" or some other type of "non-insurance contracts." Therefore, since the exclusion is subject to two equally plausible interpretations, the Court finds that it is ambiguous as it applies to viatical settlement agreements.

The Court also finds the "security broker/dealer exclusion" relied upon by Utica

to be ambiguous as it applies to viatical settlement agreements. At the time the Utica policy was in effect, it was unclear whether viatical settlements were securities under Georgia law.[5] The Court finds that, after applying general principles of contract construction, a reasonable insured could reach two equally plausible interpretations of this exclusion—one interpretation being that viaticals are securities and the other being that they are not. Therefore, the "security broker/dealer exclusion" is ambiguous insofar as it relates to viatical contracts.

## C. Parol Evidence of the Parties' Intent

Although the Court has found as a matter of law that the policy provisions relied upon by Utica are ambiguous, this conclu-

---

4. The Court purposefully uses the "double-negative" because "not a non-insurance contract" is not necessarily synonymous with "insurance contract."

5. Prior to July 1, 2002, viatical contracts were not specifically listed in the statutory definition of "security" under Georgia law. Georgia law did provide that "investment contracts" were included in the definition of "security." *See* O.C.G.A. § 10–5–2(26) (2000). Georgia law specifically excluded insurance policies from the definition of "security." *Id.* The Georgia General Assembly has amended these statutory provisions, and effective July 1, 2002, "viatical investments" are expressly included in the definition of "security" under Georgia law. O.C.G.A. § 10–5–2(26) (Supp. 2003).

Utica takes the position that, even prior to July 1, 2002, viatical contracts should have been considered "investment contracts" and therefore securities under Georgia law. The Georgia courts have never addressed this issue, and other courts that have addressed it have reached conflicting results. *Compare S.E.C. v. Life Partners, Inc.,* 87 F.3d 536 (D.C.Cir.1996) (holding viatical settlements should not be characterized as "investment

contracts") *with Siporin v. Carrington,* 200 Ariz. 97, 23 P.3d 92 (Ariz.App.2001) (finding viatical settlements meet the definition of an "investment contract" contained in an Arizona statute that closely parallels the pre-July 1, 2002, version of O.C.G.A. § 10–5–2).

The Court finds it unnecessary to determine whether viatical settlement agreements fall within the Georgia statutory definition of "securities" as the law existed prior to July 1, 2002. Whether these viatical agreements were "securities" under Georgia statutory law is not dispositive of the issue before the Court. The issue before the Court is whether a reasonable insured would have concluded from the *language in the Utica policy* that the viatical settlements would be considered "securities" for purposes of that policy and thus subject to the "broker/dealer exclusion." If the law during the relevant time period clearly considered these viatical settlements to be "securities," then one would be hard pressed to argue that a reasonable insured would conclude otherwise. However, if it is unclear as to whether such agreements would be considered "securities," as it undoubtedly was prior to July 1, 2002, then one reasonable insured may make one conclusion and a different insured may reach a contrary conclusion—a classic example of an ambiguity.

sion does not end the inquiry. To avoid summary judgment, Costa must still produce evidence from which a reasonable jury could conclude that the parties intended for his sale of viatical settlement agreements to be covered under the Utica policy. Since the policy provisions are ambiguous, Costa can produce parol evidence from outside the four corners of the Utica policy to oppose summary judgment. *Livoti*, 590 S.E.2d at 164, 2003 WL 22499600 at *4.

Costa has submitted alleged admissions by Utica that it considered the sale of the viatical agreements to be covered under its policy. These admissions were both oral and written. Costa has also produced evidence that Utica clearly was aware that he was engaged in the viatical business, and yet it did nothing to inform him that this aspect of his business was not covered under the Utica policy. In contrast, Utica did inform Costa that his exercise equipment and phone business were not covered. The Court concludes that a reasonable jury could conclude from this evidence that the parties intended for the Utica policy to cover the viatical business in which Costa was engaged. Consequently, summary judgment is not appropriate.[6]

## CONCLUSION

The policy exclusions relied upon by Utica to escape from its obligations to defend and indemnify Costa are ambiguous. Therefore, the Court must look beyond the four corners of the policy to determine the intention of the parties. The parol evidence produced by Defendants is sufficient for a reasonable jury to conclude that the parties intended for the conduct that forms the basis of the underlying lawsuit to be covered under the Utica policy. Accordingly, Plaintiff's Motion for Summary Judgment is denied.

---

6. The Court makes one final observation. Its ruling should not be misconstrued to suggest that coverage exists under the Utica policy or that the Utica exclusions are ambiguous in every context. The Court has narrowly concluded that the pertinent exclusions in the Utica policy are ambiguous insofar as they relate to the sale of viatical agreements prior to July 1, 2002, and that a jury question exists as to the intention of the parties regarding coverage for the claims in the underlying lawsuit.