[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14911

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 5, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:10-cv-01509-RLV

OMV ASSOCIATES LIMITED PARTNERSHIP,

Plaintiff - Appellant,

versus

TRIMONT REAL ESTATE ADVISORS, INC.,
TDA-LB-UBS-2000-C5, LLC,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 5, 2012)

Before EDMONDSON, KRAVITCH and FARRIS,* Circuit Judges.

PER CURIAM:

OMV Associates, L.P. (OMV) sued TDA-LB-UBS 2000-C5, LLC (TDA), a

_____

* Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by
designation.

special purpose entity, and TriMont Real Estate Advisors (collectively, TriMont) for breach of contract. At issue in this appeal is whether certain securities used as collateral in the transaction that is the source of the dispute between the parties unambiguously came ultimately to rest with TDA under the several agreements entered into to accomplish the transaction. The district court held that they did, and, for that reason, dismissed OMV's complaint. We agree and therefore affirm.

I.

In 2000, OMV obtained a $70 million loan secured by an office building that OMV owned. Six years later, OMV sought to obtain a release of the mortgage on its building. The 2000 loan agreement, however, included prepayment penalties, and so OMV arranged a defeasance transaction that would permit it to refinance the loan while avoiding the penalties. To do so, OMV enlisted the services of TriMont. TriMont prepared, and the parties signed, an Engagement Letter detailing the services TriMont would provide and outlining the strategy for the transaction, which would entail a series of contracts and would involve TriMont's creation of TDA especially for purposes of this transaction.

In the defeasance transaction, rather than paying off the loan balance early with the proceeds of a refinancing, OMV would substitute both the collateral securing the loan and itself as the borrower, thereby avoiding the prepayment

2

penalties. TDA stepped into OMV's shoes as borrower, assuming OMV's liability under the loan. And, in place of the mortgage on its office building, OMV pledged new collateral in the form of United States Treasury Securities (the Pledged Collateral) to secure the loan.

In the Engagement Letter, TriMont agreed to provide the following services: "(1) Consulting services with respect to the defeasance of the Loan, including coordinating the process with the lender and its counsel; (2) establishing and maintaining [TDA,] the Successor Borrower . . . ; and (3) coordinating the acquisition of the [Pledged Collateral]." In return for the consulting services, OMV agreed to pay TriMont a $32,500 fee.

The Engagement Letter also provided that, after TriMont created TDA, OMV and TDA would enter into a subsequent agreement under which TDA would assume OMV's "obligations under the loan documents and defeasance documents," including "liability for any shortfall in the Pledged Collateral Account, in the event the Securities are insufficient to make all scheduled payments" and "liability for any Events of default under the loan documents until the maturity date of the loan . . . ." In exchange, OMV agreed that, "to the extent that any funds remain[ed] in the Pledged Collateral Account at the maturity date of the Loan (as a result of inefficiencies in the portfolio of Securities, prepayments,

3

etc.), such funds shall hereafter remain the property of Successor Borrower." But the agreement further provided that "any . . . interest income earned on cash amounts held in the . . . account" would be shared "at a ratio of 75% to [OMV] and 25% to [TriMont]."

On July 24, 2006, after TriMont created TDA, coordinated the purchase of the Pledged Collateral, and established the account into which they would be placed, OMV, TriMont, and several other entities effectuated the defeasance transaction through the execution of three agreements.[1]

First, OMV signed a Defeasance Pledge and Security Agreement (Security Agreement) with the Lender, Wells Fargo Bank, and Wachovia Bank (as servicer of related agreements). OMV gave the Lender a first-priority security interest in the securities and their proceeds as substitute collateral for the refinanced loan. OMV warranted, among other things, that it was "the owner of good and marketable title to all of the Pledged Collateral, subject to the terms of [a] certain Defeasance Assignment, Assumption and Release Agreement [(Assignment Agreement)]," but recognized that most of its obligations would cease once it

---

[1] OMV attached only the Engagement Letter to its complaint, but does not challenge the district court's reliance upon the other agreements involved in the defeasance transaction, which TriMont submitted along with its motion to dismiss. Although, as a general rule, deciding whether a complaint states a claim involves examining only its allegations, when another document is central to the plaintiff's claims and its authenticity is not in question, we may consider it. *FindWhat Investor Gr. v. FindWhat.com*, 658 F.3d 1282, 1297 n.15 (11th Cir. 2011).

"transferred all of its right, title and interest in the Pledged Collateral in accordance with the terms of the Defeasance Documents . . . ." Wells Fargo and the Lender agreed, in Section 13, to return to OMV after the loan was paid or the collateral released, "in accordance with the provisions of the Defeasance documents, . . . such of the Pledged Collateral" in their possession "as shall not have been sold or otherwise applied pursuant to the terms hereof . . . ." Finally, OMV reiterated that it "may assign certain of its rights and obligations under this Agreement to [TDA,] pursuant to [the Assignment Agreement]."

Second, these same four parties entered into a Defeasance Account Agreement (Account Agreement), in which Wells Fargo agreed to hold the Pledged Collateral in a specially designated Pledged Collateral Account. In the Account Agreement's recitals, the parties contemplated that, "immediately upon [its] execution," OMV, the Lender, Wachovia, Wells Fargo, and TDA, "would enter into [the Assignment Agreement] . . . pursuant to which, among other things, [OMV] will transfer all of its right, title and interest in and to the Pledged Collateral to [TDA], subject to the rights of the [Lender], and the obligations of [Wells Fargo]." And Wells Fargo agreed, immediately "upon the assumption of this [Account] Agreement by [TDA] pursuant to the [Assumption Agreement], to assign to the account TDA's tax identification number" so that "all taxable income

earned or gain realized with respect to the Pledged Collateral shall be taxable, as applicable, of [TDA]." OMV directed Wells Fargo, "[a]fter the contemplated assignment by [OMV] to [TDA]" was accomplished, to hold "any amounts" in the account until the "final payment of all amounts required under the [loan] and other Defeasance Documents . . . , whereupon . . . any amounts remaining in the Pledged Collateral Account shall be remitted to [TDA], within five (5) Business Days after the final payment date under the [loan]."

As planned, the parties entered immediately thereafter into the Assignment Agreement, the last of the three contracts signed that day and the only one to which TDA was a party. The parties acknowledged that OMV "ha[d] granted to the [Lender], pursuant to [the]. . . Security Agreement," a security interest in the Pledged Collateral. They also acknowledged that they "ha[d] entered into the . . . Account Agreement, pursuant to which [Wells Fargo] . . . established and will maintain an account to hold [OMV's] interest in the Securities and other collateral." After acknowledging these prior agreements, the Assignment Agreement accomplished the central purpose of the whole transaction: placing TDA into OMV's shoes with respect to the collateral and loan obligations. Specifically:

> [OMV] hereby sells, transfers and assigns to [TDA]. . . (a) the

6

Secured Obligations including, without limitation, all obligations, rights and duties in, to and under, and subject to the terms of, the Defeasance Documents and (b) all of [OMV]'s right, title and interest in and to the Pledged Collateral, subject to the terms of the Defeasance Documents and to the rights of [the Lender] and the obligations of [Wells Fargo] pursuant to the Security Agreement and the Defeasance Account Agreement.

As a condition of TDA's assumption of OMV's liability under the loan, OMV "acknowledge[d] and agree[d] that all proceeds from the Pledged Collateral in excess of amounts due under the Defeasance Documents" would be used to pay TDA's expenses in satisfying the loan obligations "and any balance will be the sole property of [TDA]."

Ultimately, for reasons not relevant on appeal, the loan was paid in full in May 2010, six months before the predicted final repayment date. Because the loan was paid early, over $2,000,000 in securities remained in the Pledged Collateral Account. TriMont and TDA claimed that they were entitled to keep these excess securities, and, when they refused to remit the securities to OMV on demand, OMV sued for breach of contract.

TriMont filed a motion to dismiss, arguing that the securities ultimately came to rest with TDA under the plain language of the Assignment Agreement. In response, OMV conceded that "[t]he Assignment Agreement did pass all right, title and interest in the securities to TDA," but contended that, read in conjunction

7

with the other agreements, there was an ambiguity as to whether OMV retained some right to them under a theory of equitable title or the implied duty of good faith and fair dealing. Applying Georgia contract law, the district court reasoned that OMV unambiguously transferred to TDA in the Assignment Agreement all of its rights in the Pledge Collateral, including to any remainder when the transaction concluded. That conclusion was bolstered by the Engagement Letter's provision that any funds remaining in the Pledged Collateral Account after repayment of the loan would remain TDA's property. Because the agreements between the parties unambiguously gave TDA the right to the leftover securities, the district court dismissed OMV's complaint. OMV appeals.

## II.

We review *de novo* a district court's dismissal of a complaint for failure to state a claim, accepting the allegations in the complaint as true. *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011). To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).

Under Georgia law, an issue of contract construction is, at the outset, a

question of law. *Livoti v. Aycock*, 590 S.E.2d 159, 164 (Ga. Ct. App. 2003).[2] The first step is to determine the intent of the parties based solely on the language employed in the four corners of the document. *Id.* When, as here, multiple contracts are used to effect the same transaction, the documents must be viewed as a whole. *See Maiz v. Virani*, 253 F.3d 641, 568-59 (11th Cir. 2001) (applying Georgia law). If the agreements' language is ambiguous, the court must apply applicable rules of construction. *Livoti*, 590 S.E.2d at 164. Only if the ambiguity is not resolved by application of these rules does the agreements' interpretation become a jury question. *Id.*

Further, "[t]his Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (internal quotation marks and citations omitted). A mere recitation of the

---

[2] We rely upon Georgia law throughout this opinion. All of the defeasance agreements contain choice-of-law provisions indicating that they are to be interpreted according to New York law. But in its motion to dismiss, TriMont relied exclusively upon Georgia law even though it discussed all of the contracts at issue in this case. OMV relied exclusively on Georgia law in response. And, although TriMont flagged the choice-of-law issue in its reply brief to the district court, its analysis relied, with no meaningful exceptions, on Georgia law. Likewise, both parties' briefs on appeal essentially rely only upon Georgia law. Both parties have waived any objection they may have had to our application of Georgia law in this case. *See Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1256–57 (11th Cir. 2006) (holding that choice-of-law arguments, if not properly presented to the district court, are waived). Moreover, TriMont concedes that, "the choice of law should not affect the outcome of this appeal."

factual allegations "is insufficient to preserve an argument; the argument itself must have been made . . . ." *Ledford v. Peeples*, 657 F.3d 1222, 1258 (11th Cir. 2011). Nonetheless, we have exercised discretion to consider newly raised theories under certain circumstances. *Wright v. Hanna Steel Corp.*, 270 F.3d 1336, 1342-43 (11th Cir. 2001).

III.

After examining the series of agreements that accomplished this transaction, the district court concluded that there was no real ambiguity about TDA's ownership of the leftover securities. We are inclined to agree. Our review of the contracts reveals a sequence of agreements under which various rights and obligations moved between five different parties in a process to accomplish a mutually agreed-upon result. At the end of that sequential process, all right, title, and interest in the securities rested with TDA along with all rights and obligations under the defeasance documents "without limitation," including the right to any securities remaining in the account after the loan was paid off.

In the Engagement Letter, the parties set out their plans to substitute TDA for OMV as borrower and the securities for the mortgage on OMV's building as collateral. When TriMont completed the preparation, OMV gave its Lender in the Security Agreement a security interest in the securities, but otherwise retained all

10

rights to them.  Next, in the Account Agreement, OMV directed Wells Fargo to hold the collateral, to which it still retained all rights, in a designated account, but once TDA assumed OMV's rights and obligations in an agreement the parties "would enter" into, to mark the securities and account as taxable property of TDA. OMV also directed Wells Fargo after the "contemplated" assumption to hold all funds in the account until the loan was payed off and then remit "any amounts remaining" to TDA within 5 days.

Finally, after acknowledging that the Security and Account Agreements had already been consummated, OMV assigned to TDA all of its duties under the loan as well as "without limitation [its] obligations, rights and duties in, to and under, and subject to the terms of, the Defeasance Documents . . . ."  In exchange, OMV transferred to TDA "all of [OMV]'s right, title and interest in and to the Pledged Collateral," without reservation of the right to their return.  And this outcome was consistent with the Engagement Letter's promise that "any funds remaining in the Pledged Collateral Account,"[3] including as a result of "prepayments" as turned out

---

[3] OMV argues that there are internal ambiguities within the Engagement Letter with respect to what "funds" and "Maturity date" mean.  But OMV and TDA agree that language in the subsequent defeasance documents would supersede conflicting language in the prior Engagement Letter.  *See St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 821-22 (11th Cir. 1999) ("It is well established under Georgia law that parties have a right to change the terms of their agreement by subsequent agreements . . . .").  Thus, any ambiguity is irrelevant in light of OMV's subsequent grant of all rights to the securities in the Assumption Agreement and Wells Fargo's promise to remit "any amounts" remaining in the account within

11

to be the case, would "remain the property of [TDA]."

In response, OMV refers us to Section 13 of the Security Agreement under which it retained the right to request from Wells Fargo and the Lender any securities remaining in their possession at the close of the transaction. This language, OMV contends, conflicts with the provisions in the other contracts that entitle TDA to all rights in the Pledged Collateral. TriMont responds that all of the agreements plainly anticipate TDA's eventual assumption in the Assignment Agreement of all of OMV's rights in the Pledged Collateral and under the other defeasance contracts, including to any leftover securities, just as the Engagement Letter, the only agreement to which TriMont was a party, had anticipated.

We need not address this alleged conflict because OMV waived this theory by failing to assert it to the district court. "[A]ppellate courts generally will not consider an issue or theory that was not raised in the district court." *Wright*, 270 F.3d at 1342 (citation and internal quotation marks omitted). In their motions to dismiss, TriMont and TDA referred extensively to the contract language which provided that all funds in the securities account, except interest income, would become the property of TDA when the loan was paid. And they argued that, to plead facts adequate to state a breach of contract claim based upon TDA's

_____

five days after "final payment of all amounts required under the [loan] . . . ."

retention of the securities, OMV had to point to "some provision" within the agreements comprising the transaction "entitling [OMV] to a return of the securities . . . ." OMV's response mentioned the Security Agreement only once, in a list of the titles of each of the contracts. Even that scant reference was simply part of OMV's contention that it was not absolutely clear that it retained no equitable interest, by analogy to trusts and mortgages — a contention markedly different from that made to us. Nowhere in OMV's response did OMV direct the district court's attention to the language upon which its argument on appeal hinges. In fact, OMV conceded in its response that the Assignment Agreement "pass[ed] all right title and interest in the securities to TDA . . . ."

As a general rule, we are reluctant to reverse a district court for reasons that it never heard. And OMV has given us no persuasive reason to do so in this case.

OMV contends it has not waived its argument because it told the district court that the agreements were ambiguous when read together. That is true, but it is not sufficient.[4] District courts are under no obligation to distill every potential

_____

[4] OMV's reliance upon *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334 (11th Cir. 2010), is misplaced. There, we considered "nearly identical language" from an agreement that had been elsewhere relied upon by the party raising it on appeal, that simply confirmed the theory actually asserted to the district court. *Id.* at 1338. And we did so only for those "narrow reasons[] and for the sake of completeness . . . ." *Id.* That is very different from OMV's reliance on purportedly conflicting language never mentioned to the district court to support a theory cut from whole cloth on appeal.

13

argument in favor of a counseled party's position. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) (*en banc*). This is especially so when, as here, doing so would require combing through well over one-hundred pages of contractual documents to conjure support for an unarticulated theory related only at the highest level of abstraction to a party's contentions. OMV never pointed the district court to any language that conflicted with the provisions that TriMont claimed entitled TDA to the excess securities. Instead, it relied upon conceptions of equitable title derived from trust and mortgage law and contended that the clauses TriMont relied upon did not indisputably deprive OMV of such title. That was not adequate to preserve the much different theory it advances on appeal.[5]

OMV also argues that, even if it waived its argument about the Security Agreement, we may nonetheless consider it for the first time on appeal. We may,

---

[5] Because Georgia law requires that a court look to "the whole contract . . . in arriving at the construction of any part," O.C.G.A. § 13-2-2(4), OMV argues that this court "cannot ignore conflicting provisions . . . regardless of whether or how they were" argued to the district court. In essence, OMV contends a party may never waive an argument based upon a contractual provision because contract construction looks to the whole contract. But OMV cites no authority for this proposition and it is plainly not the law. *See Bridge Capital Investors, II v. Susquehanna Radio Corp.*, 458 F.3d 1212, 1217 (11th Cir. 2006) (holding that, under the law of this court, a new-on-appeal theory based upon a contractual provision not referenced before the district court is waived); *see also Marvel Enters., Inc. v. World Wrestling Fed'n Entm't, Inc.*, 610 S.E.2d 583, 587 (Ga. Ct. App. 2005) (recognizing that, even if based upon contractual provisions, "[i]ssues never raised at trial will not be considered for the first time on appeal" (citation and internal quotation marks omitted). OMV's contention is, therefore, without merit.

under certain circumstances, exercise our discretion to consider an otherwise waived argument. *Wright*, 270 F.3d at 1342-43. Here, OMV asks us to do so because contract interpretation is a pure question of law and because declining to consider its contention that Section 13 of the Security Agreement creates ambiguity with the other defeasance transaction contracts would result in a miscarriage of justice. *See id.* (discussing the "miscarriage of justice" exception). Although OMV is correct on the first point, we disagree on the second.

The miscarriage-of-justice exception does not mean that "we will entertain all issues first raised on appeal whenever they [may be] outcome determinative," as OMV contends its newly asserted theory would be. *First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1060 n.8 (11th Cir. 1990). Doing so "would swallow our general rule of waiver, further impeding the efficient administration of justice." *Id.* Both parties agree that, had the contract played out as OMV and TriMont expected it to, there would have been no leftover securities. A litigant's inability to inject a new ambiguity into a contract about who will recoup an unanticipated sum will rarely be a miscarriage of justice when that party received the benefit of its bargain. And, because it never discussed at all the contract under which it claims entitlement to the unexpected excess securities, OMV did not fulfill its obligation to fairly present its theory to the district court.

Refusing to relieve OMV of the consequences of that omission by declining to consider OMV's newly identified ambiguity will not work the kind of injustice that would incline us to consider an otherwise waived argument.

Further, OMV's reliance upon the implied covenant of good faith and fair dealing is also misplaced. "'Good faith' is a shorthand way of saying substantial compliance with the spirit, and not merely the letter, of a contract." *Fisher v. Toombs Cnty. Nursing Home*, 479 S.E.2d 180, 184 (Ga. Ct. App. 1996). But "[t]here can be no breach of an implied covenant of good faith where a party has done what the provisions of the contract expressly give him the right to do." *Nobel Lodging, Inc. v. Holiday Hospitality Franchising, Inc.*, 548 S.E.2d 481, 484 (Ga. Ct. App. 2001). As set out above, we agree with the district court's conclusion that the contracts unambiguously grant TDA the right to the leftover securities, and there was no breach of the covenant of good faith.

Finally, we reject OMV's argument that general notions of equity require us to reverse the district court. OMV's argument that its complaint should not be dismissed because, otherwise, TDA will receive a windfall is a policy contention with no bearing on the outcome of this case. We are not in the business of rewriting lawyer-drafted contracts for sophisticated parties when they wish that the outcome after performance had been different. OMV received the benefit of its

16

bargain, the release of its building from the mortgage without a prepayment penalty. That TDA may have received a higher-than-anticipated payment for arranging the accomplishment of that result is no reason to reverse.

## IV.

For the foregoing reasons, the judgment of the district court dismissing OMV's complaint for failure to state a claim is

**AFFIRMED**.