BLACK, Circuit Judge:
Appellant Susquehanna Radio Corporation (Susquehanna) appeals the district court’s grant of summary judgment to Appellee Bridge Capital Investors, II (BCI) in this breach of contract action. Specifically, Susquehanna contends the district court erred when it held Susquehanna’s Construction Permit unambiguously became a “Final Order” — as defined in Section 5.4(d) of the parties’ Asset Purchase Agreement (the Agreement) — before May 23, 2003, thus requiring Susquehanna to pay BCI the $10 million additional payment set forth in Section 2.4.[1] We affirm.
I. BACKGROUND
The Federal Communications Commission (FCC) has a standard, two-step proeedure for relocating an existing FM radio station to a new community. First, the station’s licensee must obtain an FCC Report and Order (Reallotment R&O), which amends the Table of Allotments to allow the station to broadcast from a new community of license. If the FCC issues such a Reallotment R&O, the licensee must then secure a Construction Permit (CP) to build broadcast facilities at the new location. In summary, the licensee must obtain two separate FCC orders to relocate its existing FM radio station: (1) the Reallotment R&O and (2) the CP.
On November 6, 1996, Susquehanna agreed to purchase the assets of two Anniston, Alabama, radio stations (collectively the Station) from Sapphire Broadcasting, Inc. (Sapphire) for $15.05 million. Seeking to relocate the Station to the more lucrative Atlanta-area market of College Park, Georgia, Susquehanna agreed to pay Sapphire an additional $10 million upon satisfaction of three conditions. These three conditions — each of which pertains solely to the CP — appear in Section 2.4 of the Agreement:[2] (1) the FCC grants Susquehanna a Class C-3 CP without any “material adverse conditions,” as defined in Section 2.4; (2) the CP meets Susquehanna’s *1215 Atlanta-area broadcast coverage requirements; and (3) Susquehanna “obtains the Final Order for a CP” within six years of the Agreement’s May 22, 1997, closing date (i.e., before May 23, 2003). Section 5.4(d) defines the term “Final Order”:
The term “Final Order” shall mean an FCC order which is not reversed, stayed, enjoined, set aside, annulled or suspended and with respect to which no timely filed request for administrative or judicial review, reconsideration or stay is pending, and as to which the time for filing any such request, or for the FCC to set aside its order on its own motion, has expired.
After receiving the $15.05 million initial payment for the Station from Susquehanna, Sapphire assigned to BCI its rights to the $10 million additional payment.
Susquehanna filed a Petition for Rule Making with the FCC on November 6, 1997, requesting a Reallotment R&O that would enable it to relocate the Station from Anniston to College Park. Preston W. Small then submitted a competing proposal to move his Midgeville, Georgia, station to Social Circle, Georgia. If granted, Small’s counterproposal would have prevented Susquehanna from moving the Station to College Park. On April 28, 2000, the FCC granted Susquehanna’s petition and denied Small’s counterproposal by means of a Reallotment R&O.
Between June 16, 2000, and August 19, 2002, Small filed multiple petitions for reconsideration of the Reallotment R&O and motions to reopen the record. The FCC denied each petition and motion. On January 22, 2004, the FCC also precluded Small from filing further requests for administrative relief or rehearing. Small then sought review of the Reallotment R&O in the U.S. Court of Appeals for the D.C. Circuit, but the court denied his petition for review on May 19, 2005, and denied his request for rehearing en banc on July 26, 2005. See Small v. FCC, 161 Fed.Appx. 11, 12 (D.C.Cir.2005).
On November 14, 2000, while Small’s first petition for reconsideration of the Reallotment R&O was pending, the FCC granted Susquehanna its requested Class-3 CP. In accordance with Section 2.4, this CP did not contain any “material adverse conditions” and satisfied Susquehanna’s Atlanta-area broadcast coverage requirements. Susquehanna proceeded to construct its broadcast facilities in College Park and received FCC program test authority to begin broadcasting the Station. Since January 2001, the Station has continuously broadcast from College Park as “All the Hits Q100.” Nevertheless, when BCI requested the $10 million additional payment from Susquehanna, Susquehanna asserted its CP did not become a “Final Order” before May 23, 2003, as required under Section 2.4, and thus refused payment.
BCI filed suit on June 29, 2004, alleging Susquehanna’s CP became a “Final Order” before May 23, 2003, and, therefore, Susquehanna’s refusal to make the $10 million additional payment constituted a breach of contract. Both parties moved for summary judgment. On January 26, 2005, the district court determined Susquehanna’s CP became a “Final Order” prior to May 23, 2003, and BCI was thus entitled to summary judgment on its breach of contract claim. The district court accordingly awarded BCI $10 million plus interest and attorney’s fees and costs. This appeal ensued.
II. STANDARD OF REVIEW
“We review de novo the district court’s grant of summary judgment, applying the same legal standards as the district court, and viewing all facts and reasonable inferences drawn therefrom in the light most favorable to ... the non-moving par *1216 ty.” Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir.2000).
III. DISCUSSION
This appeal presents the following question of contract interpretation: Did Susquehanna’s CP unambiguously become a “Final Order” — as defined in Section 5.4(d) of the Agreement — before May 23, 2003? To answer this question, we must look first to Section 15.8, which instructs us to construe the Agreement in accordance with New York law. Under New York law, “[w]hether a contract is clear or ambiguous is for the court to determine as a matter of law.” Fetner v. Fetner, 293 A.D.2d 645, 741 N.Y.S.2d 256, 258 (N.Y.App.Div.2002). “[W]here the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument,” id., and “the case is ripe for summary judgment,” Am. Express Bank, Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (N.Y.App.Div.1990).
With these basic rules of contract interpretation in mind, we begin our analysis of the Agreement’s relevant language. Again, Section 2.4 stipulates the $10 million additional payment “shall only be due and owing by [Susquehanna] to [BCI] if [Susquehanna] obtains the Final Order for a CP” before May 23, 2003. As explained above, the Reallotment R&O and the CP are separately issued FCC orders. Accordingly, the parties could have made the additional payment due and owing upon, among other events, Susquehanna’s acquisition of (1) the “Final Order” for a Reallotment R&O; (2) the “Final Order” for a CP; or (3) the “Final Order” for both a Reallotment R&O and a CP. The language of Section 2.4 unambiguously indicates the parties opted for the second option and made the additional payment due and owing only upon Susquehanna’s acquisition of “the Final Order for a CP.”
We now" turn to Section 5.4(d) to determine whether the CP became a “Final Order” before May 23, 2003. Section 5.4(d) sets, forth three requirements for the CP to qualify as a “Final Order”:
(1) the CP has never been “reversed, stayed, enjoined, set aside, annulled or suspended”;
(2) “no timely filed request for administrative or judicial review, reconsideration or stay is pending” “with respect to” the CP; and
(3) (a) “the time for filing any such request [for administrative or judicial review, reconsideration or stay of the CP] ... has expired,” and
(b) “the time ... for the FCC to set aside [the CP] on its own motion ... has expired.”
After reviewing the parties’ briefs, the record, and the relevant statutes, regulations, and case law, we conclude each of these three requirements was satisfied before May 23, 2003. First, the CP was never “reversed, stayed, enjoined, set aside, annulled or suspended.” Second, the Secretary of the FCC, Marlene H. Dortch, certified that “no request for administrative or judicial review, reconsideration or stay has been filed with respect to [the CP].” Third, the “time for filing any such request [for administrative or judicial review, reconsideration or stay of the CP]” expired on December 17, 2000 (i.e., 30 days after the FCC issued public notice of the CP on November 17, 2000), see 47 U.S.C. §§ 402(b)-(c), 405(a), and the “time for ... the FCC to set aside [the CP] on its own motion” expired on December 27, 2000 (i.e., 40 days after the FCC issued public notice of its grant of the CP on November 17, 2000), see 47 C.F.R. § 1.117. In short, the CP became a “Final Order,” as defined in Section 5.4(d), no later than December *1217 27, 2000 — -nearly two and a half years before the Agreement’s six-year deadline. Accordingly, we hold Sections 2.4 and 5.4(d) unambiguously obligate Susquehanna to pay BCI an additional $10 million.
Seeking to make an end-run around the Agreement’s unambiguous language, Susquehanna argues Section 5.4(d)’s second requirement — i.e., “no timely filed request for administrative or judicial review ... is pending” “with respect to” the CP — was not satisfied before May 23, 2003. Specifically, Susquehanna asserts Small’s multiple requests for administrative and judicial review of the Reallotment R&O constituted “timely filed requests for administrative or judicial review” with respect to the CP. Because these requests for administrative and judicial review of the Reallotment R&O were “pending” between June' 16, 2000, and July 26, 2005, Susquehanna thus contends the CP did not become a “Final Order” until July 26, 2005 — over two years after the Agreement’s six-year deadline.[3]
The gravamen of Susquehanna’s argument is that we should judicially rewrite Sections 2.4 and 5.4(d) to make the additional payment due and owing upon the Reallotment R&O and the CP becoming “Final Orders” before May 23, 2003. When contracting parties express their intent in unambiguous language, however, “words cannot be read into [the] contract which import an intent wholly unexpressed when the contract was executed.” In re Rivas’ Trust, 100 N.Y.S.2d 357, 365 (N.Y.Sup.Ct.1950) ' (quotation omitted). The parties did not refer to the Reallotment R&O in Sections 2.4 and 5.4(d); instead, they unambiguously agreed to make the $10 million additional payment contingent upon the CP — and the CP alone— becoming a “Final Order,” as defined in Section 5.4(d), before May 23, 2003. If Susquehanna genuinely intended to link the additional payment to the Reallotment R&O’s finality, it should have exercised greater care in negotiating the language employed in Sections 2.4 and 5.4(d).[4]
*1218 Furthermore, Susquehanna fails to direct our attention to a single pre-Agreement statute, regulation, or FCC case indicating that a CP can only become a “Final Order” if the related Reallotment R&O becomes a “Final Order.” If such authority existed, we could arguably read the words “Reallotment R&O” into Sections 2.4 and 5.4(d), because, “unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made.” Dolman v. U.S. Tmst Co. of N.Y., 2 N.Y.2d 110, 157 N.Y.S.2d 537, 138 N.E.2d 784, 787 (1956). Susquehanna accordingly cites three FCC cases — In re Meridian Communications, 2 F.C.C.R. 5904, 1987 WL 344375 (1987); In re Open Media Corp., 8 F.C.C.R. 4070, 1993 WL 756892 (1993); and In re KWQJ(FM), Anchorage, Alaska,- 10 F.C.C.R. 8774, 1995 WL 481212 (1995)— for the proposition that FCC case law, in force when the parties contracted, defines “Final Order” as “a [CP] that is not. subject to FCC or judicial review in the underlying [Reallotment R&O] proceeding.”
This argument is unavailing, however, because the facts in these three cases are not, as Susquehanna asserts, “indistinguishable from the facts in this case.” Indeed, none of these three cases involved a Reallotment R&O. Rather, in each case, (1) Applicant A and Applicant B submitted mutually exclusive CP applications to construct a new radio station; (2) the FCC dismissed Applicant A’s CP application, and Applicant A petitioned for reconsideration of this dismissal; (3) the FCC granted Applicant B’s CP application; and (4) the FCC held Applicant B’s grant could not become “final” until the FCC adjudicated Applicant A’s petition for reconsideration. Meridian Commc’ns, 2 F.C.C.R. at 5904; Open Media, 8 F.C.C.R. at 4070, 4072; KWQJ(FM), 10 F.C.C.R. at 8774-75. At best, therefore, these three cases stand for the proposition that one applicant’s administrative or judicial challenge to the FCC’s dismissal of its CP application prevents the FCC’s grant of another applicant’s mutually exclusive CP from becoming a “Final Order.”
*1219 In contrast, this case stems from Susquehanna’s efforts to relocate an existing FM radio station and involves two distinct FCC orders — the Reallotment R&O and the CP. As discussed above, neither Small nor any other person brought an administrative or judicial challenge to the FCC’s grant of Susquehanna’s CP application; instead, Small challenged only the Reallotment R&O. The three FCC cases Susquehanna cites simply do not address whether Small’s challenge- to the Reallotment R&O prevented Susquehanna’s subsequent CP from becoming a “Final Order.” Susquehanna has thus failed to cite any law, in force at the time the parties executed the Agreement, stating a CP cannot become a “Final Order” until the related Reallotment R&O becomes a “Final Order.”[5] Accordingly, we cannot “presume[ ] that the parties had such law in contemplation when the contract was made,” Dolman, 157 N.Y.S.2d 537, 138 N.E.2d .at 787, and Susquehanna’s proffered interpretation of Section 5.4(d)’s second requirement lacks merit.
Contrary to Susquehanna’s suggestions, our interpretation of Sections 2.4 and 5.4(d) does not give rise to an unfair result.[6] Since January 2001, Susquehanna has reaped the financial benefits of continuously broadcasting the Station throughout the Atlanta area as “All the Hits Q100.” As the district court noted, therefore, Susquehanna has “realized the benefit of its bargain.” ■ BCI, on the other hand, has not yet “realized the benefit of its bargain,” because Susquehanna refuses to surrender the $10 million additional payment. In short, Susquehanna has thus far managed to pay BCI an Anniston-area price for an Atlanta-area radio station. *1220 The Agreement’s unambiguous language indicates the parties did not contract for such an outcome.[7]
IV. CONCLUSION
For the foregoing reasons, we conclude Susquehanna’s CP unambiguously became a “Final Order,” as defined in Section 5.4(d), no later than December 27, 2000 (i.e., nearly two and a half years before Section 2.4’s six-year deadline). Susquehanna’s refusal to make the $10 ■ million additional payment required under Section 2.4 thus constitutes a breach of the Agreement. We accordingly affirm the district court’s grant of summary judgment to BCI.
AFFIRMED.

. Susquehanna also contends the district court should have granted it summary judgment under the equitable doctrine of judicial estoppel. After reviewing the parties' briefs, the record, and the relevant case law, we conclude the district court did not abuse its discretion when it rejected Susquehanna's judicial estoppel claim. See Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1284 (11th Cir.2002) (applying the abuse of discretion, standard of review to the district court's application of judicial estoppel).

. Section 2.4 provides (emphasis added):
2.4 Additional Payment. In the event the [FCC] grants a Construction Permit (“CP”) without any “material adverse conditions" (as hereinafter defined in this Section 2.4) to WHMA-FM for a location that will provide coverage substantially similar in population, square miles and location to that shown on Schedule 2.4, which CP grant has become a Final Order (as defined in Section 5.4(d)), Buyer will pay to Seller, upon program test authority or six (6) months from the date the CP grant has become a Final Order, whichever occurs sooner, an amount, in addition to the amount set forth in Section 2.1, as follows:
(c) If the CP is for a Class C-3 facility or below, the amount will be Ten Million Dollars ($10,000,000).
Additional consideration as set forth in [subsection (c)] above shall only be due and owing by Buyer to Seller if Buyer obtains the Final Order for a CP within six (6) years of the Closing Date.

. The dissent devotes Part A of her opinion to analyzing the latter portion of Section 5.4(d)’s third requirement — -i.e., "the time ... for the FCC to set aside [the CP] on its own motion ... has expired.” Based on this analysis, the dissent concludes the CP "could not have become a 'Final Order' until forty days after the judicial review of the Reallotment R&O ... terminated” on July 26, 2005. Dissenting Op. at 1222.
Yet, in its district court briefs, Susquehanna never addressed Section 5.4(d)’s third requirement; instead, it based its argument solely on Section 5.4(d)’s second requirement. Most importantly, Susquehanna expressly addressed the second requirement’s language, asserting (1) the Reallotment R&O "was subject to pending administrative review as of May 22, 2003,” (2) "the FCC’s continued review of [the Reallotment R&O] constituted] review of the CP,” and, (3) "[accordingly, on May 22, 2003, the CP was subject to administrative review and was not a 'Final Order.' ” In contrast, Susquehanna either failed or declined to provide any analysis of the third requirement's language. Furthermore, each time Susquehanna quoted Section 5.4(d) in its district court briefs, it bolded the language of the second requirement; it did not, however, bold the language of third requirement. This selective textual emphasis highlighted for the district court that Susquehanna focused its argument exclusively on Section 5.4(d)’s second requirement.
Susquehanna therefore never presented the district court with the third-requirement-related argument the dissent raises in Part A of her opinion. Under our circuit's case law, we thus deem waived any argument Susquehanna may have had as to Section 5.4(d)'s third requirement. See, e.g., Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A., 377 F.3d 1164, 1170 (11th Cir.2004) ("To be clear, it is not our position that [appellant] waived its argument because it did not sufficiently raise it below; rather, ... [we] conclude that [appellant] did not previously raise the issue at all. Therefore, we decline to address it for the first time on appeal.”); Chapman v. AI Transp., 229 F.3d 1012, 1044 (11th Cir.2000) ("It is axiomatic that an argument not raised before the trial court ... has been waived.”).

. To support its argument about Section 5.4(d)’s second requirement, Susquehanna *1218 points in part to Paragraph 7 of the CP, which provides:
The grant of this permit is conditioned on the final outcome of [Small’s Petition for Reconsideration of the Reallotment R&O]. The final outcome of that proceeding may require WHMA-FM to change frequency, class, or site location. Accordingly, any construction undertaken pursuant to this permit is at the permittee’s sole risk. See Meridian Communications, 2 FCC Red 5904 (Rev.Bd.1087).
According to Susquehanna, thi's conditional language indicates the FCC considered Small’s challenges to the Reallotment R&O as challenges to the CP as well, and, therefore, the CP could not become a "Final Order” until the Reallotment R&O became a “Final Order.”
This argument lacks merit for at least two reasons. First, Paragraph 7 merely reiterates a fact known to both parties at the time of contracting — i.e., if the FCC granted Susquehanna a Reallotment R&O and a CP, but then revoked the Reallotment R&O, Susquehanna’s'CP alone would not enable it to broadcast the Station from College Park. As we suggest above, Susquehanna could have avoided this well-known risk by making the $10 million additional payment expressly contingent upon both the Reallotment R&O and the CP becoming "Final Orders.” It either failed or declined to do so, however, and we may not "make a new contract for the parties under the guise of interpreting the writing.” See Vt. Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876 (N.Y.2004) (quotation omitted). Second, the FCC’s certification that "no request for administrative or judicial review, reconsideration or stay has been filed with respect to [the CP]” indicates the FCC did not consider Small’s challenges to the Reallotment R&O as challenges to the CP as well.

. As indicated in footnote four, supra, the FCC cited Meridian Communications in Paragraph 7 of the CP. Perhaps, as Susquehanna seems to suggest, the FCC included this citation because it analogized the facts of Meridian Communications to the facts of this case, and concluded Small’s challenge to the Reallotment R&O prevented the CP from becoming a "Final Order.” Because the FCC did not state its reasons for citing Meridian Communications, we have no way of knowing for certain. Regardless, under Dolman, we must limit our analysis to "the law in force at the time the agreement [was] entered into.” 157 N.Y.S.2d 537, 138 N.E.2d at 787. The FCC issued the CP roughly four years after the contract was signed. Thus, even assuming the FCC expanded Meridian Communications’ holding by citing it in the CP, Susquehanna still fails to identify any controlling law existing at the time of contracting.

. Nor is our interpretation unreasonable when considered in the context of radio-industiy transactions. True, under our interpretation, Susquehanna assumed a certain amount of risk. If the CP had become a "Final Order” before May 23, 2003, but the FCC or D.C. Circuit had overturned the .Reallotment R&O, Susquehanna would have had to pay an additional $10 million, even though it could not broadcast from College Park. In the context of this Agreement, however, the risk Susquehanna assumed was relatively small. Indeed, the FCC has acknowledged that ”[o]nly a very small percentage of ... challenges [to Reallotment R&Os] are ultimately successful” and "the vast majority of petitions for reconsideration [of Reallotment R&Os] are ultimately denied.” In re Amendment of Section 1.420(f) of the Commission’s Rules Concerning Automatic Stays of Certain Allotment Orders, 11 F.C.C.R. 9501, 9502, 9505 (1996).
Given the apparent unlikelihood of the FCC or the D.C. Circuit overturning the Reallotment R&O, Susquehanna knew it would significantly improve its chances of successfully relocating the Station to College Park upon obtaining the CP. Once Susquehanna had the CP in hand, it could construct broadcast facilities in College Park, receive program test authority, begin broadcasting, and, most importantly, make money. We therefore think it reasonable to assume, based on the unambiguous language of Sections 2.4 and 5.4(d), that the parties (1) regarded the CP as the lynchpin of Susquehanna's efforts to relocate the Station, and, consequently, (2) made the additional payment due upon the CP itself becoming a "Final Order.”

. The dissent concludes by questioning our "methodology,” asserting that this case "belongs in a different class ... [because it] is centered on the question of ambiguity — where differences in interpretation should almost always compel the same conclusion: that the relevant language is ambiguous.” Dissenting Op. at 1224. We respectfully submit that the dissent's critique overlooks the well-established principle of contract interpretation-that ambiguity does not exist simply because the parties urge different interpretations of a contract’s terms. See Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 141 N.E.2d 590 (N.Y.1957) ("Mere assertion by one that contract -language means something to him [or her], ■ where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact.”).