Robert N. Scola, Jr., United States District Judge
In its complaint, Plaintiff Julian Depot Miami, LLC seeks a judgment declaring that Defendant Home Depot U.S.A., Inc. is required, under the parties' agreement, to reconstruct a retail building Home Depot demolished after it was damaged by a fire in 2013. Julian Depot also asks the Court to declare that the parties' lease requires Home Depot to continue to pay rent until or unless it reconstructs the building. The parties have filed cross motions for summary judgment. Although the parties agree that the terms of the lease are unambiguous, they nonetheless quarrel over how those terms should be interpreted. Julian Depot maintains that the lease requires Home Depot to pay rent, apparently forever, until it rebuilds the razed improvements. Home Depot, on the other hand, submits the lease does not require it to rebuild and that its rent obligation expires at the end of the first twenty-year term of the lease in 2028. For the reasons *1357 that follow, the Court agrees with Home Depot, thus granting Home Depot's motion for summary judgment (ECF No. 64 ) and denying Julian Depot's motion (ECF No. 63 ).
1. Background[1]
Home Depot, in December 2006, entered into a land lease with Julian Depot's predecessor-in-interest, Tallahassee LLC (the "Lease"). (Compl. ¶¶ 5, 11, ECF No. 1-2, 3; Def.'s Stmt. of Facts ¶ 9; Pl.'s Resp. to Def.'s Stmt. ¶ 9.) Under the Lease, the initial twenty-year term of the Lease was subject to four five-year renewal options. According to the agreement, Home Depot had the option of constructing a retail building on the leased, but then as-yet-undeveloped, land, but was not required to do so. (See, e.g. , Pl.'s Mot. at 19.). Ultimately, Home Depot exercised its rights under the Lease and completed construction of a store on the parcel in March 2008 and thereafter opened and began operating the store. (Pl.'s Stmt. of Facts ¶ 19-20, ECF No. 62, 10; Def.'s Stmt. at ¶¶ 23-25.) Julian Depot took title to the property, assuming the Lease, in December 2012. (Pl.'s Stmt. at ¶ 21; Def.'s Opp. to Pl.'s Stmt. at 3, 5, ECF No. 71.) Less than a year later, on November 5, 2013, a fire significantly damaged the store. (Pl.'s Stmt. at ¶ 22; Def.'s Stmt. at ¶ 28.) A month later, Miami-Dade County's Regulatory and Economic Resources Department issued a notice of violation, ordering that the store either be repaired or demolished. (Pl.'s Stmt. at ¶ 23; Def.'s Stmt. at ¶ 29.) The County determined that the building was unsafe noting a number of issues: "falling away, hanging loose or loosening of siding, block, brick, or other building material"; "unusual sagging or leaning out of plumb of the structure or any part of the structure ... caused by deterioration or over-stressing"; "[t]he electrical or mechanical installation or systems create a hazardous condition"; and "substantial[ ] damage[ ]" to the building "by the elements, acts of God, fire, explosion or otherwise." (Def.'s Stmt. at ¶ 31; Pl.'s Resp. to Def.'s Stmt. at ¶ 31.) Home Depot claims it "removed the debris after the fire and secured the [l]and." (Def.'s Stmt. at ¶ 36). Julian Depot disagrees with Home Depot's characterization and instead maintains that "Home Depot obtained a demolition permit" and that its contractor thereafter "removed a building down to the slab and capped off all utilities." (Pl.'s Resp. to Def.'s Stmt. at ¶ 36.) In any event, Home Depot has elected not to rebuild the store and there is no evidence in the record that Home Depot ever intended to rebuild. (Def.'s Stmt. at ¶ 40; Pl.'s Resp. to Def.'s Stmt. at ¶ 40.)
Julian Depot's complaint centers on Home Depot's refusal to rebuild its home-improvement store. In seeking a declaratory judgment,[2] Julian Depot submits it is uncertain regarding its rights and obligations under two sections of its Lease with Home Depot. According to Julian Depot, these two sections, 8.9(a)(i) and 10.1, require Home Depot to reconstruct any improvements that have been razed or demolished. (Compl. at ¶¶ 76-78.) Julian Depot also submits that if Home Depot has not completed construction of the replacement improvements by 180 days prior to the end of the twenty-year term, the Lease will automatically extend and Home Depot must continue to pay 115% of the annual base rent until (or unless) construction is completed. (Id. at ¶¶ 78, 82.C.)
Julian Depot maintains it is entitled to summary judgment in that there can be no *1358 dispute that sections 8.9(a)(i) and 10.1 "require Home Depot to Rebuild the Improvements at the Premises." (Pl.'s Mot. at 2.) For its part, Home Depot does not dispute that it must pay the increased rent based on its decision not to rebuild. But in seeking summary judgment itself, and opposing Julian Depot's cross-motion, Home Depot nonetheless insists the Lease does not impose an unyielding obligation on it to reconstruct the building. Home Depot also asserts the Lease will terminate, by its terms, on January 31, 2028, unless either (1) Home Depot exercises an option to extend or (2) Julian Depot exercises it right of early termination. Notwithstanding the parties' divergent views on their rights and obligations, they both maintain that the Lease is unambiguous.
2. Legal Standard
Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ; Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." Hickson Corp. v. N. Crossarm Co. , 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Id. at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co. , 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ; Jackson v. BellSouth Telecomms. , 372 F.3d 1250, 1280 (11th Cir. 2004). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." Bannum, Inc. v. City of Fort Lauderdale , 901 F.2d 989, 996 (11th Cir. 1990).
Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, documents, depositions, answers to interrogatories, admissions, or other materials, and designate specific facts showing that there is a genuine issue for trial. Celotex , 477 U.S. at 323-24, 106 S.Ct. 2548 ; Fed. R. Civ. P. 56(c)(1)(A). The nonmovant's evidence must be significantly probative to support the claims. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court will not weigh the evidence or make findings of fact. Id. at 249, 106 S.Ct. 2505 ; Morrison v. Amway Corp. , 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. Morrison , 323 F.3d at 924.
3. Analysis
According to Home Depot, it is not required to reconstruct the demolished retail building or to pay rent beyond 2028, the expiration of the Lease's initial twenty-year term. In support of its position, Home Depot points to one provision of the Lease-section 7.3-that explicitly absolves Home Depot of the obligation and another provision-section 10.1-that describes Home Depot's rebuilding of any damaged improvements as optional. Home Depot also maintains that the provision that Julian Depot relies on to sustain its claim that Home Depot must pay rent until it rebuilds, is inapplicable under the *1359 circumstances of this case. Julian Depot counters that Home Depot has cherry-picked discrete phrases and isolated various provisions of the contract and in doing so has neglected the intent of the Lease as a whole and nullified certain provisions entirely. Julian Depot also insists that the provision requiring continued rent payments, beyond the first twenty-year term of the Lease-section 8.9(a)(i)-is clearly applicable. As set forth below, the Court finds Julian Depot's arguments unavailing.
A. Contract Interpretation Principles
Although the parties each urge different interpretations of the Lease's terms, neither disputes that the Lease and other related agreements "clear[ly] and unambiguous[ly]" set forth "Home Depot's rebuilding obligations ... in the event of a fire and the demolition of the building." (Pl.'s Mot. 4-5.)[3]
As such, and "[u]nder general contract principles, the plain meaning of a contract's language governs its interpretation." Slater v. Energy Services Group Intern., Inc. , 634 F.3d 1326, 1330 (11th Cir. 2011) (citing Belize Telecom, Ltd. v. Belize, 528 F.3d 1298, 1307 & n. 11 (11th Cir. 2008) ) ; see also Bridge Capital Inv'rs, II v. Susquehanna Radio Corp. , 458 F.3d 1212, 1220 (11th Cir. 2006) (noting "the well-established principle of contract interpretation that ambiguity does not exist simply because the parties urge different interpretations of a contract's terms"). "The court must look at the contract as a whole, the parties, and the purpose of the agreement to best determine the intent of the parties in interpreting the agreement." Slater , 634 F.3d at 1330 (citing Pennzoil Co. v. F.E.R.C. , 645 F.2d 360, 388 (5th Cir. 1981) ). In assessing a written agreement, the parties' intent "is derived from the objective meaning of the words used [and e]xtrinsic evidence of the parties' subjective understanding is not consulted unless the contract is ambiguous." Feaz v. Wells Fargo Bank, N.A. , 745 F.3d 1098, 1104 (11th Cir. 2014) (citations omitted). When, however, "provisions in a contract appear to be in conflict, they should be reconciled, if possible." Whitley v. Royal Trails Prop. Owners' Ass'n, Inc. , 910 So.2d 381, 385 (Fla. 5th Dist. App. 2005). And "[a]n interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect." Id. (quotation omitted); Hirsch v. Jupiter Golf Club LLC , 232 F.Supp.3d 1243, 1253-54 (S.D. Fla. 2017) (Marra, J.) ("courts must strive to interpret a contract in such a way as to give meaning to all provisions while doing violence to none") (quotations omitted).
B. Section 7.3 absolves Home Depot of reconstructing the damaged improvements.
The introductory language of section 7.3, titled "Failure to Open or Operate," states as follows: "Notwithstanding any provision contained herein or in any other documents to the contrary, Tenant shall have no obligation to construct any improvements upon the Premises or open or operate in the Premises." (Lease at 11; ECF No. 65-1, 33.) The remainder of section 7.3 details "the economic consequences of failing to open or operate." (Id. )
According to Home Depot, under this clause, regardless of whether there are other provisions elsewhere to the contrary, *1360 Home Depot cannot be forced to construct improvements. Despite the clear and straight forward language of this clause, Julian Depot insists such an interpretation would be an "overreaching reading of Section 7.3." (Pl.'s Mot. at 4.) In support of its insistence that this provision does not mean what it plainly appears to mean, Julian Depot maintains that section 7.3 "only applies to [Home Depot's] initial decision to construct improvements" and does not have any effect on Home Depot's obligation to re build once Home Depot actually constructs improvements on the premises. (Id. at 19 (emphasis in original).) Julian Depot's supposition is based on a number of arguments, none of which the Court finds persuasive.
First, Julian Depot points to the contrast between section 7.3's use of the word "improvements," with a lowercase "i," and the reference, elsewhere in the Lease, to "Improvements," with a capital "I." In section 3.2(c), the Lease defines "Improvements"-capital "I"-as "all improvements and fixtures [on the Premises[4] ], including, without limitation, the Retail Building, the Parking Field, the Access Drives, and the Signage ... and any other associated improvements." (Lease at 3.) Based on this discrepancy, between the use of the defined term and the lower-case term, Julian Depot maintains that the word "improvements" used in section 7.3 applies "only ... to improvements that Home Depot has never constructed at all." (Pl.'s Mot. at 19 (emphasis in original).) According to Julian Depot, because section 7.3 only references "improvements"-lowercase "i"-it cannot possibly override other sections of the Lease that might require Home Depot to rebuild "Improvements"-capital "I"-that have been damaged, razed, or otherwise removed. (Pl.'s Resp. at 15-16.) The Court finds this to be a tortured interpretation. The "notwithstanding" clause relieves Home Depot, among other things, from having to construct "improvements upon the Premises." (Lease at 11.) Included in the definition of "Improvements" are "all improvements" on the Premises. (Id. at 3.) Because Home Depot has no obligation, under section 7.3, to "construct any improvements upon the Premises" (id. at 11 (emphasis added) ), it would defy logic to find that Home Depot, at the same time, has an obligation to nonetheless construct "Improvements."
Julian Depot complains that interpreting section 7.3 in this way allows "Home Depot [to] simply ignore" any other provision of the Lease that requires rebuilding of removed or damaged Improvements "under any set of circumstances and without any meaningful consequences, aside from a small rent increase." (Pl.'s Resp. at 16 (emphasis in original).) But that's precisely what a "notwithstanding" clause does: "the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." Cisneros v. Alpine Ridge Group , 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) ; see also Waverly 1 and 2, LLC v. Waverly at Las Olas Condo. Assn., Inc. , 242 So.3d 425, 428 (Fla. 4th Dist. App. 2018) (finding a proposed interpretation of a "notwithstanding" clause to the contrary "not reasonable"). This interpretation does not, as Julian Depot contends, "render superfluous" the requirements of other sections of the Lease or "run counter" to the goals of the transaction as a whole. (Pl.'s Resp. at 16 (alteration omitted) ) (quoting *1361 Nabbie v. Orlando Outlet Owner, LLC , 237 So.3d 463, 467 (Fla. 5th Dist. App. 2018).)
Instead, Home Depot is still subject to penalties if it opts not to reconstruct and is forced to continue paying rent, at least until the expiration of the initial term-even though the space is unusable. If one of the overriding goals of the Lease was indeed to ensure, as Julian Depot proposes, that Home Depot would maintain at all times, unconditionally, "a fully fixtured and stocked retail store, capable of driving traffic to the retail establishments in the larger shopping center development" (Pl.'s Resp. at 16 (quotations omitted) ), then the parties would not have allowed Home Depot the option of never constructing a store to begin with. In reviewing the plain language of the agreement, the intent of the parties is evident: indeed, it was certainly important to the landlord to have an operating retail store on the property; thus, the Lease provides the landlord with increased rent payments if the parcel remains idle. And the Lease also sets forth time limitations regarding how long Home Depot has, for example, to rebuild after a fire. Setting such a time limit affords the landlord control over the property: if the time period is exceeded, the landlord has the right to re-enter the Premises and to either relet the premises or to terminate the Lease. (Lease at 30, sections 13.1(b)-(c); see also Lease at 12, section 7.3(c) (allowing landlord to terminate if tenant fails to maintain at least 75% of the retail building open); Pl.'s Resp. at 16-17 (acknowledging that the Lease permits the landlord to terminate the Lease with respect to any "Dark Space" and bring in a new tenant "no matter what plans Home Depot may have for the Premise.").) On the other hand, the landlord can also choose to do nothing and simply continue to receive the increased rent payments until Home Depot's term expires. But just because the plain language of the Lease shows it was important to Julian Depot to have an operating retail store on the premises, Julian Depot's contention that the unyielding goal of the Lease was to ensure that Home Depot itself maintained a retail store on the premises at all costs, is simply not supported by the plain language of the Lease: just because the Lease provides an incentive to Home Depot to rebuild and maintain an operating store, does not mean that Home Depot is categorically required to do so. Accordingly, Julian Depot's argument-that interpreting section 7.3 based on its plain meaning would be at odds with the Lease's overarching goal-is untenable.
Julian Depot also points to section 18.3 of the Lease to support its supposition that section 7.3 only applies to Home Depot's initial obligation to build. As Julian Depot explains, section 18.3 sets forth the parties' agreement "to allow Home Depot to terminate the Lease without building anything, during an 'Approval Period' of two to four months." (Pl.'s Mot. at 19.) Julian Depot's argument seems to be that because Home Depot is afforded this initial termination right in section 18.3, section 7.3 can only be read to be a confirmation, and nothing more, of this prerogative. Similarly, Julian Depot relies on language from a development agreement that the landlord and Home Depot entered into contemporaneously with the Lease. According to Julian Depot, through this development agreement, "the parties acknowledged that Home Depot's obligations with respect to the construction of any improvements would not be binding until after the 'Approval Period' had elapsed and Home Depot had confirmed the 'satisfaction and/or waiver of certain conditions set forth in the Lease.' " (Id. at 19-20 (quoting the development agreement, ECF No. 1-2, 160).) Julian Depot again insists that because the development agreement includes this language, regarding when Home Depot's obligations kick in, section 7.3 cannot possibly *1362 refer to anything other than Home Depot's initial obligations, prior to constructing any improvements. Julian Depot's logic is flawed with respect to both section 18.3 as well as the language referred to in the parties' development agreement. The Court finds nothing in the plain language of section 7.3 that would limit its applicability to only Home Depot's initial decision to construct improvements. Likewise, there is nothing in the provisions Julian Depot relies on that would restrict the operation of section 7.3 in this way either.
C. Section 10.1 does not require Home Depot to reconstruct the damaged improvements.
Article X of the Lease, titled "Damage or Destruction," contains two provisions, section 10.1 and 10.2. Section 10.1 addresses "Damage and Destruction to Premises" and Section 10.2 addresses "Damage and Destruction During Last Eighteen [ ] Months of Term." (Lease at 25.) Section 10.1 reads as follows:
If the Retail Building or any of Tenant's other improvements on the Premises are damaged or destroyed during the Term by a casualty loss, Tenant shall, at its election and at its expense, rebuild and restore the Retail Building and other Improvements pursuant to Section 8.2[5] above. Tenant shall have full use of and the right to apply any insurance proceeds available for such rebuilding and restoration. No such casualty or damage to or destruction or demolition of any of the Improvements shall affect Tenant's obligation to pay Rent, including Additional Rent or any other sums required to paid by Tenant hereunder. Tenant shall, within twenty-four (24) months from the date of such damage or destruction or within such shorter period of time as shall be reasonable, use all insurance proceeds to restore or cause restoration of all Improvements then existing on the Premises to as good a condition as existed prior to such damage or destruction and to an architectural design and appearance, harmonious with that which was destroyed or damaged, subject, however, to the terms of Section 8.2. above. This Lease shall continue in full force and effect with no abatement whatsoever of Rent, including, without limitation, Additional Rents or any other sums required to by paid by Tenant hereunder.
(Id. (emphasis added).) Despite the use of the word "election," Julian Depot asserts that section 10.1 "contains a clear command that the tenant must restore or rebuild the Improvements in the event of a fire or other casualty." (Pl.'s Mot. at 9.) In support of its position, Julian Depot points to the repeated use of the word "shall" throughout this section. (Pl.'s Mot. at 10.) Julian Depot appears to assume that "shall" can only mean "must." But depending on context, "the term 'shall' can be construed as [either] 'must' or 'may.' " Allstate Ins. Co. v. Orthopedic Specialists , 212 So.3d 973, 978 (Fla. 2017), reh'g denied , SC15-2298, 2017 WL 1130950 (Fla. Mar. 27, 2017) (citing Black's Law Dictionary (10th ed. 2014) ). And certainly to translate the use of the word "shall" as "must" in the Lease clause that provides "Tenant shall, at its election ... rebuild and restore [damaged] Improvements" would not make sense. The only way to give effect to all the words in this clause would be to construe "shall" as "may."
Julian Depot further complains, however, that such an interpretation is also at odds with the clause that provides, "Tenant *1363 shall, within twenty-four [ ] months from the date of such damage ... use all insurance proceeds to restore or cause restoration of all Improvements then existing on the Premises to as good a condition as existed prior to such damage." (Lease at 25.) Again, though, Julian Depot's interpretation would read the word "election" out of the first sentence of section 10.1. While the Court agrees with Julian Depot that "shall" here means "must," it does not agree that the clause therefore categorically forces Home Depot to rebuild any damaged Improvements. Instead, should Home Depot elect to rebuild, this clause simply requires Home Depot to complete the reconstruction within twenty-four months. That is, under this provision, the landlord is required to tolerate twenty-four months of downtime, should Home Depot elect to rebuild. Beyond that, however, Home Depot would be in breach of the agreement-thus allowing Julian Depot to avail itself of its termination or repossession rights provided for elsewhere in the Lease.
Julian Depot's proposed interpretation, on the other hand, would, again, require the Court to ignore the inclusion of the word "election" and to conclude that Julian Depot was entitled to actually force Home Depot to rebuild any damaged Improvements. Both of these outcomes are unacceptable: "An interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect." Whitley , 910 So.2d at 385 (quotations omitted). Julian Depot maintains, and Home Depot does not dispute, that under Florida law, there is a "general prohibition on actions for specific performance of a lease and for specific performance of a contract for rebuilding." (Pl.'s Resp. at 11 (citing Mayor's Jewelers, Inc. v. State of Cal. Pub. Employees' Ret. Sys. , 685 So.2d 904, 904-06 (Fla. 4th Dist. App. 1996) and Calypso Lounge, Inc. v. Spitzer Mgmt., Inc. , 362 So.2d 393, 394 (Fla. 3rd Dist. App. 1978) ).) As such, Julian Depot's proposed reading of this section would, according to Julian Depot's own assessment of Florida law, lead to an unlawful interpretation of the Lease. Julian Depot's proposed interpretation is similarly at odds with Julian Depot's own acknowledgement that both parties to the contract "presumed that the Landlord would be unable to obtain specific performance of the rebuilding requirements." (Pl.'s Reply at 8-9.) Of course Julian Depot's proposed reading furthermore improperly fails to give effect to all of the contract terms by reading the word "election" out of the Lease. In short, Julian Depot's proposal runs counter to the rule of construction that "require[es] courts to read provisions of a contract harmoniously in order to give effect to all portions thereof." City of Homestead v. Johnson , 760 So.2d 80, 84 (Fla. 2000) ; Eq. Lifestyle Properties, Inc. v. Fla. Mowing & Landscape Serv., Inc. , 556 F.3d 1232, 1242 (11th Cir. 2009) (noting that courts "must read the contract to give meaning to each and every word it contains, and [ ] avoid treating a word as redundant or mere surplusage if any meaning, reasonable and consistent with other parts, can be given to it") (quotations in original omitted).
Julian Depot also focuses on a clause in section 10.2 that requires Home Depot to "raze all unstable portions of any [damaged] Improvements and remove all debris from the Premises." (Lease at 25.) As Julian Depot points out, section 10.2 "explicitly acknowledge[s] Home Depot's right to 'raze' the Improvements and remove them ... when a casualty event occurs during the last 18 months of the Lease" while section 10.1 does not. (Pl.'s Mot. at 11.) This discrepancy between the two sections, Julian Depot argues, means that the parties deliberately meant to preclude Home Depot from razing any Improvements, under *1364 section 10.1, in the event of a casualty event occurring prior to the last eighteen months of the Lease. (Pl.'s Mot. 11.) The Court finds this argument unconvincing. Section 10.2 allows Home Depot to terminate the Lease if more than 25% of the Retail Building is damaged within the last eighteen months of a rental term. (Lease at 25.) Coupled with this right is the requirement that Home Depot "put the Improvements in a lawful and safe condition, raze all unstable portions of [the damaged] Improvements and remove all debris from the Premises." (Id. ) Additionally, section 10.2 entitles Julian Depot "to all insurance (or self-insurance) proceeds in connection with any such damage." (Id. ) The two provisions deal with two distinct events. In one, where the casualty occurs prior to the last eighteen months of a term, Home Depot is on the hook for continued rent payments, even if it elects not to rebuild, assuming Julian Depot does not choose to repossess the property or otherwise terminate the Lease. In the second scenario, where the casualty event occurs within eighteen months of the end of a term, Home Depot can pull the plug on its rent obligations, terminating the Lease and turning over its insurance proceeds immediately.
Nothing about this interpretation renders section 10.2 "superfluous" as Julian Depot contends. Instead, this interpretation, based on the plain language of the Lease, affords the parties certain options and assurances depending on when within a term a casualty event might occur: the landlord is assured rent payments if Home Depot does not rebuild and the landlord is unable to secure a higher paying tenant should a lengthy term remain at the time of the casualty event; or, should the casualty event occur closer to the end of the term, Home Depot is relieved of its rent obligations, including increased payments, while at the same time Julian Depot is assured that Home Depot won't terminate the Lease without being required to stabilize the property and turn over all the insurance proceeds received. This also presumably affords Julian Depot the opportunity to construct a building of its choosing or to simply retain the insurance proceeds.
Julian Depot also argues that if Home Depot fails to comply with the rebuilding requirements set forth in section 10.1, then "the automatic renewal of the Lease" term in section 8.9(a)(i) will be triggered. (Pl.'s Resp. at 11, 12.) According to Julian Depot, "linking [the] requirements ... under Lease Section 8.9(a)(i) to ... Section 10.1 provides the Landlord with a mechanism to incentivize Home Depot to comply with its rebuilding and restoration obligations." (Id. at 11.) The problem with Julian Depot's contention, however, is that there is nothing in section 10.1 that actually connects, either directly or implicitly, the "automatic renewal" in section 8.9 to section 10.1. The Court thus finds no support for Julian Depot's contention that, should Home Depot avail itself of its right to "elect" not to rebuild, Home Depot must continue to pay rent indefinitely.
D. Section 8.9(a)(i) does not apply under the circumstances.
Section 8.9 is titled "Alterations; Demolition and Construction of Improvements." (Lease at 19.) Under part (a)(i) of this section, Home Depot is afforded "the right ... to raze or demolish any existing Improvements and to construct new Improvements on the Premises, provided" it complies with a number of requirements. (Id. ) Among these conditions is that the "new or replacement Improvements" be "substantially complete[d] ... not later than ... 180 days prior to the end of the Term." (Id. ) If Home Depot has failed to complete the improvements within that timeframe, the Lease automatically renews for "the next succeeding [five-year] Option *1365 Term." (Id. ) Or, if all four five-year terms have already been applied, the Lease "shall be deemed to have been extended for ... such period of time as shall be required in order to Substantially Complete the new or replacement Improvements." (Id. )
Julian Depot maintains that this section, like section 10.1, evinces "a clear command" that Home Depot "must rebuild the Improvements" or face paying rent forever "if it opts to raze or demolish them ... prior to vacating the premises." (Pl.'s Mot. at 7 (capitalization and emphasis used in original omitted).) There are two key problems with Julian Depot's position. First, this section does not apply under the circumstances. And second, Julian Depot's proffered interpretation-that the Lease extends in perpetuity so long as Home Depot does not rebuild-is unsupported.
To begin with, by its terms, section 8.9(a)(i) applies only when the tenant plans to both "raze or demolish any existing Improvements and to construct new Improvements." (Lease at 19 (emphasis added).) Julian Depot's position hinges on its determination that this provision can be applied when Julian Depot only razes the Improvements without any accompanying construction of new Improvements. Such an interpretation, however, would require the Court to read "and," as used in this section, to instead actually mean "or." Julian Depot provides no plausible basis for such an interpretation.
There is no indication from the title of this section or the terms of the section itself that the parties intended for this provision to apply under these circumstances. Neither party disputes that the 2013 fire caused significant damage to the Home Depot retail building. (E.g. , Pl.'s Stmt. at ¶ 22.) Nor do the parties disagree that the County ordered Home Depot to either repair the property or to demolish it. (Id. at ¶ 23.) Julian Depot itself acknowledges that "[t]he contractor working for Home Depot obtained a demolition permit" (Pl.'s Resp. to Def.'s Facts at ¶ 36, ECF No. 72) and that the notice of commencement indicated that the contractor "would remove the Retail Building down to slab and cap off all utilities" (Pl.'s Stmt. at ¶ 26 (internal quotations omitted) ). There is nothing in the record, presented by either party, that even hints that Home Depot ever intended to construct any new improvements in conjunction with its demolition activities. Indeed, Julian Depot's counsel wrote Julian Depot's lender, after the fire, informing that there had been "a fire at the Home Depot store which resulted in the premises being declared unsafe by [the] County as a result of which Home Depot was required to demolish the improvements on the property." (Def.'s Stmt. at 37.) Julian Depot's insistence that "Home Depot took on a clear and unequivocal obligation to rebuild the Improvements and complete them within six months of the termination of the Lease, as soon as it obtained a permit to demolish and completed the full removal of the Improvements" is simply not supported by the either the plain language of section 8.9(a)(i) or the record.
A closer inspection of one of the conditions imposed on Home Depot, should it choose to raze and reconstruct, supports this conclusion. Part (B) of section 8.9(a)(i) requires the tenant, under this section, to construct new Improvements that "have the same or greater value as the value of the Improvements existing immediately prior to [their] demolition." (Lease at 19.) It would make little sense to apply this clause where the "value of the Improvements existing immediately prior to ... demolition" are greatly diminished by, as here, a casualty event. In considering the Lease in its entirety, the Court concludes that the plain language of the agreement indicates the parties intended sections 10.1 *1366 and 10.2 to govern where there has been a casualty event and section 8.9(a)(i) to govern where the tenant razes functioning and intact improvements as part of a planned reconstruction process. Even Julian Depot itself suggested that such a scenario might arise, under section 8.9(a)(i), where, "for instance," Home Depot sought to "respond to changes in its business ... such as the need to expand its garden[-]center offerings." (Pl.'s Mot. at 8.) It is hard to imagine the parties contemplating a scenario where Home Depot would ever simply choose to raze a fully operational and undamaged building if it were not also intending to do so in conjunction with planned renovations. Julian Depot's contention then, that section 8.9(a)(i) was intended to apply to such an absurd and unanticipated situation, is unavailing. See CitiMortgage, Inc. v. Turner , 172 So.3d 502, 504 (Fla. 1st Dist. App. 2015) ("where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner") (quotation omitted).
Additionally, even if section 8.9(a)(i) did apply, Julian Depot's contention that Home Depot would be required to pay rent indefinitely under this provision would in any event fail based on the plain language of the agreement. The Lease requires only an "exten[sion] for [ ] the next succeeding Option Term" or, if no terms remain, "for such period of time as shall be required in order to [s]ubstantially [c]omp[l]ete the new or replacement Improvements." Under the first scenario, the longest the Lease can be extended is for five years-the length of one option term only as "Term" is singular. Under the second scenario, where Home Depot has already exercised all its options, the term is extended for the amount of time "required ... to substantially complete the new or replacement Improvements." By its plain meaning, this does not obligate Home Depot to pay rent forever. It merely extends the Lease for a period of time equal to the amount of time that would be necessary for construction to be completed-it does not , by its plain language, extend the Lease until such construction is actually completed. Such a provision is not unreasonable. An extension like this could, for example, afford Julian Depot the opportunity, if it chose, to "re-enter the Premises," as provided for under section 13.1(b) for example, and collect rent from Home Depot for as long as it might take to complete an unfinsihed project. There is nothing in the agreement that indicates the parties ever intended for the tenant to obligate itself to pay rent forever-even if it undertook a complete reconstruction of the Improvements and failed to complete them before the expiration of the Lease. Further, in Florida, "[l]eases in perpetuity are universally disfavored" and "courts are [therefore] loath to construe a right to renewal as perpetual ... unless the language of the agreement clearly and unambiguously compels them to do so." Chessmasters, Inc. v. Chamoun , 948 So.2d 985, 986 (Fla. 4th Dist. App. 2007). Not only does the language in the Lease fail to "clearly and unambiguously compel[ ]" the Court to construe a perpetual rent obligation, but the natural and ordinary meaning of the words used explicitly identifies a limited extension period.
E. Julian Depot's argument that Home Depot's position fails to take into account the true purpose of the Lease is unavailing.
One of Julian Depot's overarching arguments is that the parties' agreement, when considered in its entirety, reinforces "Home Depot's obligation to rebuild by confirming, again and again," the Landlord's entitlement to take title to the Improvements at the end of the Lease. (Pl.'s Mot. at 6, 14.) According to Julian Depot, *1367 "no [fewer] than five other Lease provisions support" this notion: sections 3.2(c), 8.5, 7.3(b) 9.1(c)-(d), and 11.4. (Pl.'s Mot. at 14-18.) After careful review, the Court finds Julian Depot's contention misses the mark.
Section 3.2(c) requires Home Depot, "upon the expiration of the Term," to surrender to Julian Depot, "the Premises and all improvements and fixtures thereon ... in their then existing condition free and clear of all liens created by Tenant." (Lease at 3.) Further, under this section, the parties agree that "[t]itle to all Improvements ... remaining upon the Premises at the expiration of the Term shall automatically pass to Landlord." (Id. ) Similarly, section 8.5 provides that "[a]fter the expiration ... of this Lease, title to the Improvements on the Premises shall become vested in Landlord." (Lease at 18.) Julian Depot is convinced that these two sections (1) mandate that "the value of Home Depot's investment in the Premises ... must ultimately pass to the Landlord at the end of the Lease"; and (2) establish that Home Depot's "essential obligation ... under the Lease" was to "build[ ], maintain[ ], and restor[e] the Improvements."
First, even if Julian Depot is correct, that these sections require Home Depot to convey the value of Home Depot's investment in the Premises at the termination of the Lease to Julian Depot, such a duty does not equate to an unflagging requirement that Home Depot rebuild any damaged or razed improvements. Second, nothing in either section supports such a requirement in any event. In fact, section 3.2(c) explicitly acknowledges that the improvements are to transfer to Julian Depot only "in their then existing condition." Similarly, section 8.5 simply provides a streamlined mechanism for title to any improvements to automatically vest in Julian Depot at the end of the Lease.
Likewise, Julian Depot's reliance on section 7.3(b) is also unavailing. As even Julian Depot characterizes it, this section only requires Home Depot to pay increased rent in the event any portion of the retail space becomes non-operational. (Pl.'s Mot. at 15-16.) Contrary to Julian Depot's supposition, such a provision simply does not reinforce any purported rebuilding requirement. Nothing in this section, as Julian Depot urges, prevents Home Depot from "leav[ing] the Premises vacant after demolishing the Improvements or suffering a casualty event." (Id. at 16-17.)
Lastly, sections 9.1(c)-(d) and 11.4 are equally ineffective in supporting Julian Depot's position. As Julian Depot describes them, sections 9.1(c) and (d) require Home Depot to fully insure the improvements and to indemnify Julian Depot from their loss. (Pl.'s Mot. at 17.) And section 11.4 addresses the distribution of any proceeds acquired as a result of a governmental taking. (Id. at 18.) But Julian Depot fails to connect these conditions, requiring Home Depot to compensate Julian Depot for a loss, to any purported rebuilding obligation or even to the possibility of Home Depot's unlimited exposure to damages in the form of perpetual rental payments. Julian Depot's summary contention that these provisions demonstrate that "Home Depot's rebuilding obligation is clear," is simply unsupported by the plain language of Lease sections Julian Depot relies upon.
4. Conclusion
Julian Depot maintains that its request for declaratory judgment is based on the requirements set forth in sections 8.9(a)(i) and 10.1 which it claims "both contain unequivocal commands that Home Depot must rebuild the Improvements before it vacates the Premises in the event of their removal or destruction." (Pl.'s Mot. at 6.)
*1368 As set forth above, the Court does not find, as a matter of law, that either provision supports Julian Depot's claim.
Specifically, and based on the preceding analysis, the Court enters summary judgment in Home Depot's favor regarding Julian Depot's requests for declaratory judgment that (1) "the Lease requires [Home Depot] to reconstruct the Improvements upon its razing or demolition of them, so that such Improvements are of equivalent or greater value than the ones that previously existed" and (2) "the Lease requires [Home Deport] to remain in possession of the Land and to continue to pay rent through all Option Terms and beyond them, in the event that it opts not to reconstruct the Improvements as the Lease requires."[6] (Compl. at ¶ 82.B.-C.) The Court thus grants Home Depot's motion for summary judgment (ECF No. 64 )[7] and denies Julian Depot's motion for summary judgment with respect to Home Depot's obligation to rebuild and denies as moot Julian Depot's motion for summary judgment with respect to Home Depot's affirmative defenses (ECF No. 63 ).[8]
Done and ordered at Miami, Florida, on November 19, 2018.

Unless noted otherwise, the Court deems the following facts undisputed.

Julian Depot's breach of contract claim was dismissed by an earlier order. (Order on Mot. to Dismiss, ECF No. 19.)

Because the parties agree the Lease is unambiguous, the Court rejects Julian Depot's request to consider parol evidence. See State Nat. Ins. Co. v. Lamberti , 08-60760-CIV, 2009 WL 702239, at *2 (S.D. Fla. Mar. 17, 2009) (Seltzer, Mag. J.) ("parol evidence is not admissible to contradict or modify an unambiguous contract").

"Premises" is defined, in Article I, as "[t]he Land, all improvements now or hereafter located thereupon and the rights, easements and appurtenances pertaining thereto." The "Land," in turn is defined, also in Article I, simply as the real property in Homestead that is the subject of the Lease at issue in this case.

Section 8.2 of the Lease is "intentionally deleted" (Lease at 17) and, as Julian Depot acknowledges, "therefore has no bearing on Home Depot's obligations under section 10.1" (Pl.'s Mot. at 10 n. 5).

In its motion for summary judgment, Julian Depot submits that the "plain language" of the Lease "makes clear, again and again, that the value of the Improvements-in the form of the Improvements themselves or insurance monies reflecting their value represented the benefit of the bargain for the Landlord ... and a core consideration that Home Depot agreed to pay." While the issue of "insurance monies" is not before the Court, the Court nonetheless notes that Home Depot has agreed it will "fully compensate[ ]" Julian Depot's "loss of title to [the] retail building at the termination of the Lease." (Def.'s Mot. 17.) Because the matters raised in Julian Depot's complaint do not implicate "Home Depot's obligation to transfer the value of the Improvements to [Julian Depot] at the end of the Lease," the Court declines to accept Julian Depot's invitation to otherwise opine on the issue. (Pl.'s Reply at 3.)

In conjunction with its motion, Home Depot asks the Court to make a number of declarations in its favor regarding its rights and obligations under the Lease. (Def.'s Mot. 3.) Except as otherwise addressed above, however, these requests are beyond the scope of Julian Depot's complaint and therefore are not properly before the Court. The Court thus deems Home Depot's motion to be simply a motion seeking the entry of summary judgment in its favor with respect to Julian Depot's complaint.

In its complaint Julian Depot also seeks an award of fees and costs. (Compl. at ¶ 82.D.) Neither party addressed this claim in their motions for summary judgment. To the extent Julian Depot believes it is for some reason still entitled to those fees or costs, it may file a post-judgment motion to that effect in accordance with the Court's rules.